# ARMED SERVICES BOARD OF CONTRACT APPEALS

| | |
|---|---|
| Appeals of -- ) | |
| ) | |
| Raytheon Company ) | ASBCA Nos. 57743, 57798, 58280 |
| ) | |
| Under Contract No. W31P4Q-04-C-0020 ) | |

APPEARANCES FOR THE APPELLANT:  Karen L. Manos, Esq.
John W.F. Chesley, Esq.
  Gibson, Dunn & Crutcher LLP
  Washington, DC

APPEARANCES FOR THE GOVERNMENT:  E. Michael Chiaparas, Esq.
  DCMA Chief Trial Attorney
Stephen R. Dooley, Esq.
  Senior Trial Attorney
Alexander M. Healy, Esq.
Kathleen P. Malone, Esq.
  Trial Attorneys
  Defense Contract Management Agency
  Boston, MA

## OPINION BY ADMINISTRATIVE JUDGE SCOTT

Raytheon Company has appealed under the Contract Disputes Act, 41 U.S.C. §§ 7101-7109 (CDA), from three final decisions of Defense Contract Management Agency (DCMA) contracting officers (COs). The appeals are consolidated for disposition. In the decision at issue in ASBCA No. 57443, DCMA's corporate administrative CO (CACO) demanded the return of alleged government payments of allegedly expressly unallowable costs. He assessed penalties and interest against Raytheon for including the costs in its corporate incurred cost rate proposal for 2004 (2004 Corporate Proposal). In the other decisions, at issue in ASBCA Nos. 57798 and 58280, DCMA's divisional administrative CO (DACO) assessed penalties and interest against Raytheon for including alleged expressly unallowable costs in the incurred cost rate proposals of its Integrated Defense Systems (IDS) business segment for 2004 and 2005. In addition to cost allowability questions, ASBCA No. 57743 focuses upon Federal Acquisition Regulation (FAR) 42.709-5(c)'s penalty waiver provisions. In ASBCA Nos. 57798 and 58280, Raytheon does not raise penalty waiver; it advocates that the costs at issue were not expressly unallowable and thus were not subject to penalties.

The Board held a 10-day hearing on entitlement[1] in Boston, Massachusetts. Thereafter the Board denied Raytheon's motion to strike certain of the CACO's testimony and related evidence and granted the government's motion to strike certain materials proffered by Raytheon in support of its motion. *Raytheon Company*, ASBCA No. 57743 *et al.*, 16-1 BCA ¶ 36,335 (*Raytheon I*).

## FINDINGS OF FACT

### The Contract and Relevant FAR Provisions

1. Raytheon, an international high technology company, maintains its Corporate Office at its Waltham, Massachusetts headquarters, as it did in calendar years (CYs) 2004 and 2005. It provides systems and solutions for defense, homeland security and other government markets. (Supp. R4, tab 244 at 2610; tr. 3/46; 2nd amend. compl. and answer ¶ 9; gov't proposed findings of fact[2] (GPFF) ¶ 1) Contract No. W31P4Q-04-C-0020, in the amount of $134,439,577.46, between Raytheon and the U.S. Army Aviation and Missile Command, which the parties ultimately agreed would serve as the representative contract in these appeals, was effective on 30 January 2004. The contract identified itself as a Labor-Hour, Time-and-Materials, Services and Research and Development contract. Performance of all travel, other direct costs, and material efforts was on a Cost-Plus-Fixed-Fee basis, subject to the FAR 52.216-7, ALLOWABLE COST AND PAYMENT (DEC 2002) clause, which the contract incorporated by reference. DCMA administered the contract, which was for engineering services associated with the Patriot Weapon System. The contract also incorporated by reference the FAR 52.230-2, COST ACCOUNTING STANDARDS [CAS] (APR 1998); and FAR 52.242-3, PENALTIES FOR UNALLOWABLE COSTS (MAY 2001) clauses. (Supp. R4, tab 392 at 1-3, 136, 173-74) FAR Part 31 contains cost principles and procedures concerning the allowance of costs under the contract. *See* FAR 31.000.

---

[1] The parties included proposed fact findings that essentially pertain to disputed quantum issues, including Raytheon's contention that "any penalties upheld by the Board must be reduced by the amount associated with subcontracts or contracts closed using the quick-closeout procedure" (app. reply br. at 33). At least one of the issues – whether Raytheon was paid for the costs upon which the government has assessed penalties and interest – bears upon entitlement as well as quantum. These appeals involve government claims and it has the burden of proof on payment. *Alaska Aerospace Corp.*, ASBCA No. 59794, 16-1 BCA ¶ 36,498 at 177,842. However, the current record is insufficient for the Board to decide that question, which the government apparently considered to be part of a quantum determination (*e.g.*, gov't reply br. at 37-38). Because the payment issue is so closely intertwined with quantum, the Board reserves it and the other quantum issues for any quantum proceedings.

[2] Unless otherwise indicated, all cited proposed findings of fact are undisputed.

2

2. Among others addressed below, the following relevant statutory and FAR provisions were in effect at the time of Raytheon's contract award and indirect cost rate proposals in question and remain substantially the same:

Title 10 U.S.C. § 2324, **Allowable costs under defense contracts**, provides that:

> **(a) Indirect Cost That Violates a FAR Cost Principle.-**
> The head of an agency shall require that a covered contract provide that if the contractor submits to the agency a proposal for settlement of indirect costs incurred by the contractor for any period after such costs have been accrued and if that proposal includes the submission of a cost which is *unallowable because the cost violates a cost principle in the [FAR] or applicable agency supplement to the [FAR],* the cost shall be disallowed.
>
> **(b) Penalty for Violation of cost principle.-**
>
> > (1) If the head of the agency determines that a cost submitted by a contractor in its proposal for settlement is expressly unallowable *under a cost principle referred to in subsection (a) that defines the allowability of specific selected costs,* the head of the agency shall assess a penalty against the contractor in an amount equal to-
> >
> > > (A) the amount of the disallowed cost allocated to covered contracts for which a proposal for settlement of indirect costs has been submitted; plus
> > >
> > > (B) interest...to compensate the United States for the use of any funds *which a contractor has been paid* in excess of the amount to which the contractor was entitled.
> >
> > (2) If the head of the agency determines that a proposal for settlement for indirect costs submitted by a contractor includes a cost determined to be unallowable in the case of such contractor before the submission of such proposal, the head of the agency shall assess a penalty against the contractor in an amount equal to two times the amount of the

3

disallowed cost allocated to covered contracts for which a proposal for settlement of indirect costs has been submitted.

**(c) Waiver of Penalty.**-The [FAR] shall provide for a penalty under subsection (b) to be waived in the case of a contractor's proposal for settlement of indirect costs when-

....

(3) The contractor demonstrates, to the [CO's] satisfaction, that-

(A) it has established appropriate policies and personnel training and an internal control and review system that provide assurances that unallowable costs subject to penalties are precluded from being included in the contractor's proposal for settlement of indirect costs; and

(B) the unallowable costs subject to the penalty were inadvertently incorporated into the proposal.

(Italicized emphasis added)

The Allowable Cost and Payment clause provides that "[f]inal annual indirect cost rates and the appropriate bases shall be established in accordance with Subpart 42.7 of the [FAR] *in effect for the period covered by the indirect cost rate proposal.*" FAR 52.216-7(d)(1) (emphasis added). The proposal is due within the six-month period following expiration of each of the contractor's fiscal years. FAR 52.216-7(d)(2)(i).

The Penalties for Unallowable Costs clause provides that:

(b) Contractors which include unallowable indirect costs in a proposal may be subject to penalties. The penalties are prescribed in 10 U.S.C. 2324 or 41 U.S.C. 256, as applicable, which is implemented in Section 42.709 of the [FAR].

(c) The Contractor shall not include in any proposal any cost that is unallowable, as defined in Subpart 2.1 of the FAR, or an executive agency supplement to the FAR.

4

(d) If the [CO] determines that a cost submitted by the Contractor in its proposal *is expressly unallowable under a cost principle in the FAR, or an executive agency supplement to the FAR, that defines the allowability of specific selected costs*, the Contractor shall be assessed a penalty equal to-

(1) The amount of the disallowed cost allocated to this contract; plus

(2) Simple interest...

....

(e) If the [CO] determines that a cost submitted by the Contractor in its proposal includes a cost previously determined to be unallowable for that Contractor, then the Contractor will be assessed a penalty in an amount equal to two times the amount of the disallowed cost allocated to this contract.

....

(g) Pursuant to the criteria in FAR 42.709-5, the [CO] *may waive* the penalties in paragraph (d) or (e) of this clause.

FAR 52.242-3 (Emphasis added).

FAR 31.001, Definitions, states in part that:

"Compensation for personal services" means all remuneration paid currently or accrued, in whatever form and whether paid immediately or deferred, for services rendered by employees to the contractor.

....

"Directly associated cost" means any cost which is generated solely as the result of the incurrence of another cost, and which would not have been incurred had the other cost not been incurred.

5

....

"Expressly unallowable cost" means a particular item or type of cost which, under the express provisions of an applicable law, regulation, or contract, is specifically named and stated to be unallowable.

The CAS contains the same definition of "expressly unallowable cost." 48 C.F.R. § 9904.405-30(a)(2). The CAS Board "used the word 'expressly' in the broad dictionary sense-that which is in direct or unmistakable terms." CAS 405 (Accounting for Unallowable Costs), Preamble A, Item 3, 38 Fed. Reg. 24195 (Sept. 6, 1973).

FAR 31.109 Advance agreements, states in part:

(a) The extent of allowability of the costs covered in this part applies broadly to many accounting systems in varying contract situations. Thus, the reasonableness, the allocability and the allowability under the specific cost principles at Subparts 31.2, 31.3, 31.6, and 31.7 of certain costs may be difficult to determine. To avoid possible subsequent disallowance or dispute based on unreasonableness, unallocability, or unallowability under the specific cost principles at Subparts 31.2, 31.3, 31.6, and 31.7, [COs] and contractors should seek advance agreement on the treatment of special or unusual costs....

(b) Advance agreements may be negotiated either before or during a contract but should be negotiated before incurrence of the costs involved. The agreements must be in writing, executed by both contracting parties, and incorporated into applicable current and future contracts....

(c) The [CO] is not authorized by this 31.109 to agree to a treatment of costs inconsistent with this part.

FAR 31.201-6, Accounting for unallowable costs, provides that:

(a) *Costs that are expressly unallowable or mutually agreed to be unallowable, including mutually agreed to be unallowable directly associated costs, shall be identified and excluded from any billing, claim, or proposal applicable to a Government contract. A*

directly associated cost is any cost which is generated solely as a result of incurring another cost, and which would not have been incurred had the other cost not been incurred. *When an unallowable cost is incurred, its directly associated costs are also unallowable.*
[Emphasis added]

FAR 31.205-6, Compensation for personal services, provides in part:

(a) *General.* Compensation for personal services is allowable subject to the following general criteria and additional requirements contained in other parts of this cost principle.

....

(5) Costs that are unallowable under other paragraphs of this Subpart 31.2 are not allowable under this subsection 31.205-6 solely on the basis that they constitute compensation for personal services.

....

(p)(2)(i) [As used in this paragraph] *Compensation* means the total amount of wages, salary, bonuses, deferred compensation...and employer contributions to defined contribution pension plans...for the fiscal year, whether paid, earned, or otherwise accruing.

FAR 42.709, Scope, as in effect in 2004 at the time of contract award, applied to contracts such as Raytheon's at issue, *i.e.*, contracts in excess of $500,000, except fixed-price contracts without cost incentives or any firm-fixed-price contracts for the purchase of commercial items.[3] It provided that:

(a) This section implements 10 U.S.C. 2324(a) through (d) and 41 U.S.C. 256(a) through (d). It covers the

---

[3] The regulation in effect when Raytheon submitted its 2004 Corporate Proposal in 2005 was substantially the same except that it applied to contracts in excess of $550,000. The current regulation applies to contracts in excess of $750,000.

7

assessment of penalties against contractors which include unallowable indirect costs in-

(1) Final indirect cost rate proposals.

FAR 42.709-1, General, provides that:

(a) The following penalties apply to contracts covered by this section:

(1) If the indirect cost is expressly unallowable *under a cost principle in the FAR, or an executive agency supplement to the FAR, that defines the allowability of specific selected costs*, the penalty is equal to-

(i) The amount of the disallowed costs allocated to contracts that are subject to this section for which an indirect cost proposal has been submitted; plus

*(ii) Interest on the paid portion, if any, of the disallowance.*

(2) If the indirect cost was determined to be unallowable for that contractor before proposal submission, the penalty is two times the amount in paragraph (a)(1)(i) of this section.

....

(c) It is not necessary for unallowable costs to have been paid to the contractor in order to assess a penalty.

(Emphasis added)

FAR 42.709-2, Responsibilities, provides that:

(a) The cognizant [CO] is responsible for-

(1) Determining whether the penalties in 42.709-1(a) should be assessed;

8

(2) Determining whether such penalties should be waived pursuant to 42.709-5....

....

(b) The contract auditor, in the review and/or the determination of final indirect cost proposals for contracts subject to this section, is responsible for-

(1) Recommending to the [CO] which costs may be unallowable and subject to the penalties in 42.709-1(a);

(2) Providing rationale and supporting documentation for any recommendation....

FAR 42.709-3, Assessing the penalty, provides that:

Unless a waiver is granted pursuant to 42.709-5, *the cognizant [CO] shall-*

(a) Assess the penalty in 42.709-1(a)(1), when the submitted cost is *expressly unallowable under a cost principle in the FAR or an executive agency supplement that defines the allowability of specific selected costs*; or

(b) Assess the penalty in 42.709-1(a)(2), when the submitted cost was determined to be unallowable for that contractor prior to submission of the proposal. Prior determinations of unallowability may be evidenced by-

(1) A DCAA [Defense Contract Audit Agency] Form 1, Notice of Contract Costs Suspended and/or Disapproved...or any similar notice which the contractor elected not to appeal and was not withdrawn by the cognizant Government agency;

(2) A contracting officer final decision [COFD] which was not appealed;

(3) A prior...Board of Contract Appeals or court decision involving the contractor, which upheld the cost disallowance; or

9

(4) A determination or agreement of unallowability under 31.201-6.

(c) Issue a final decision ... which includes a demand for payment of any penalty assessed under paragraph (a) or (b) of this section.

FAR 42.709-4, Computing interest, describes how interest is to be computed on any paid portion of a disallowed cost.

FAR 42.709-5, Waiver of the penalty, provides that:

The cognizant [CO] *shall waive* the penalties at 42.709-1(a) when-

(a) The contractor withdraws the proposal [pre-audit]....

(b) The amount of the unallowable costs under the proposal which are subject to the penalty is $10,000 or less...; or

(c) The contractor demonstrates, *to the cognizant [CO's] satisfaction*, that-

(1) It has established policies and personnel training and an internal control and review system that provide assurance that unallowable costs subject to penalties are precluded from being included in the contractor's final indirect cost rate proposals (*e.g.*, the types of controls required for satisfactory participation in the Department of Defense sponsored self-governance programs, specific accounting controls over indirect costs, compliance tests which demonstrate that the controls are effective, and Government audits which have not disclosed recurring instances of expressly unallowable costs); and

(2) The unallowable costs subject to the penalty were inadvertently incorporated into the proposal; *i.e.*, their inclusion resulted from an unintentional error, notwithstanding the exercise of due care.

10

## Background

3. At all relevant times, Raytheon accumulated Corporate Office costs at the corporate level and allocated them to business segments for inclusion in their indirect cost rates applied to government contracts (supp. R4, tab 271 at 2958-64; app. supp. R4, tab 635; tr. 3/52-55; GPFF ¶ 2). Raytheon's Corporate Office had an Administration and Services Division (A&S) (GPFF ¶ 3), which provided financial services to corporate headquarters and corporate functional areas, including, *inter alia*, Finance, Business Development (mostly located in Washington, DC, hereafter sometimes "Washington Office"), Contracts, and Internal Audit. The A&S Controller's Office was under the Finance function. In 2004-05 a budgets staff, consisting of a senior manager, four budget analysts, and support staff (hereafter "Budgets Group"), was part of that Controller's Office. Additional budget analysts were "embedded" in some of the functional areas. A&S reported to the Corporate Controller/Vice President of Accounting. (Tr. 3/47-49, 73-74, 80-81, 4/21, 23, 5/21, 7/138, 222; ex. A-6) The Budgets Group's primary responsibilities were to help prepare and monitor each Corporate Office function's annual budget forecast and prepare the annual Corporate indirect cost proposal (tr. 3/49, 52, 79; GPFF ¶ 7).

4. At all relevant times Raytheon Corporate maintained a Corporate Government Accounting Office, which reported to the A&S Controller, and whose primary responsibilities were to oversee a government contract compliance program at Raytheon's segments and to provide guidance regarding application of the FAR and the CAS. (Tr. 3/111, 114-15, 4/60, 5/15-17, 20, 26; ex. A-6; GPFF ¶ 14)

5. Raytheon has an extensive library covering compliance with government contract laws and regulations, including those at issue (supp. R4, tabs 100, 154 at 2087, ¶ 1.1; app. supp. R4, tabs 503, 508, 514, 520, 590, 614, 700 at 4193-94; tr. 5/93-94, 183-85, 7/141, 143-45, 147, 158; GPFF ¶ 16; undisputed app. proposed findings of fact (APFF) ¶ 9)

6. Raytheon's Government Contract Compliance Policy applied to all of its organizations doing business with the government. It provided that all segments, including IDS, were required to "maintain adequate internal controls necessary to ensure compliance with" the FAR and the CAS, and that the "Raytheon Corporate Office" was covered by the policy for applicable compliance program areas. (Supp. R4, tab 154 at 2087, ¶ 5.1) Among guidelines for an effective compliance program, the policy provided that each segment have a documented procedure for preparing and submitting the final indirect cost rate proposal; its processes for screening and scrubbing for unallowable costs were adequate; and it have procedures to identify and segregate unallowable costs and directly associated costs such that they were excluded from billings to the government (*id.* at 2089, ¶¶ 7.1.1, 7.1.2).

11

7. Raytheon's Corporate Government Accounting Office also developed a detailed handbook to guide its personnel, at Corporate and throughout its business segments, including IDS, in the preparation of incurred cost proposals. For example, Raytheon's "GUIDELINES-ACCOUNTING FOR SELECTED COSTS IN ACCORDANCE WITH FAR PART 31" (FAR Part 31 Guidelines), revision 1, was issued in June 2003. The handbook has been updated about annually. (App. supp. R4, tab 526, *see also* supp. R4, tab 158; app. supp. R4, tabs 578, 631; tr. 1/203-04, 2/122, 5/18-19, 124-26, 154-56, 206-07, 7/158-59; GPFF ¶ 15; APFF ¶ 10)

8. Annually, Raytheon's Corporate Office prepares a final indirect cost proposal (sometimes "Corporate Proposal"), certifies it, and submits it to the government. The Budgets Group typically initiates preparation of a Corporate Proposal for one fiscal year in January of the next fiscal year. (*See* supp. R4, tab 271 at 2901, 2967; app. supp. R4, tab 635; tr. 3/52-53, 79, 83; GPFF ¶ 26)

9. Raytheon submitted its certified CY 2002 Corporate Proposal to the government on 5 June 2003. In its 21 November 2003 audit report, DCAA questioned some corporate aircraft costs, including $2,880 for alleged "public relations" use, which it found to be expressly unallowable and subject to a "level 1" penalty under FAR 42.709-1(a)(1) (*see* finding 2). Aircraft fractional lease costs were not at issue. DCAA also questioned and recommended a level 1 penalty regarding certain consultant costs, said to be for mergers and acquisitions (M&A) planning. Raytheon disagrees that the costs were expressly unallowable and contends that the 2002 Corporate Proposal is not in question in this appeal. (Supp. R4, tab 125 at 1629-30, 1649, 1651, 1653, 1658, 1659, 1672, 1689; *see* GPFF ¶¶ 28-30, GPFF ¶ 31 with app. add.)

10. Raytheon submitted its CY 2003 Corporate Proposal to the government on 1 June 2004. In its 28 February 2005 audit report, DCAA questioned executive and aircraft fractional lease costs. It concluded that Raytheon had not withdrawn 60 percent of its aircraft fractional lease management fees, contrary to an advance agreement with the government, and recommended a "level 2" penalty under FAR 42.709-1(a)(2) (*see* finding 2). DCAA also questioned and recommended a level 1 penalty regarding lobbying costs. DCAA stated that, of $3,774,833 Raytheon reported in lobbying costs on its 2003 consolidated tax return, DCAA was not able to verify that Raytheon withdrew $1,470,996 of the costs from its 2003 Corporate Proposal. Raytheon disagreed with DCAA's reconciliation method and that the costs were properly questioned. In this appeal, Raytheon asserts that the 2003 Corporate Proposal is not relevant. (Supp. R4, tab 244 at 2550-51, 2575, 2579-80, 2596-98, 2602, 2620; *see* GPFF ¶¶ 32-35, GPFF ¶ 36 with app. add.)

12

## Raytheon's 2004 Corporate Proposal

11. Charles Vilandre became Raytheon's A&S Senior Manager of the Budgets Group in 2004. By that time he had been working at Raytheon in finance-related roles for more than 20 years. (Tr. 3/46-47, 4/12; ex. A-1; GPFF ¶ 8) Before assuming his Senior Manager position, Mr. Vilandre had worked with his manager and Corporate Government Accounting on FAR issues. He also took a formal class on the FAR and one on the CAS. (Tr. 3/137-38) Prior to the 2004 Corporate Proposal, at issue, Mr. Vilandre took a course on understanding allowable and unallowable expenses. He had also received a Guidelines on Unallowable Costs booklet prepared by the Corporate Government Accounting Office. The 2004 Corporate Proposal was the first such proposal upon which Mr. Vilandre had worked, but the A&S Budget Group working for him had at least several years' experience in preparing corporate proposals. Mr. Vilandre worked closely with his manager and Corporate Government Accounting on the 2004 Corporate Proposal, which included $2.4 billion in indirect corporate office costs. (Supp. R4, tab 271 at 2901; tr. 4/17-19, 23-24)

12. Raytheon's Corporate Government Accounting Office, primarily James Pflaumer, a former senior auditor at DCAA, who was a manager of Raytheon Corporate Accounting from 1999-2004 and, as of October 2005, was the manager of IDS Government Accounting, communicated informally with the Budgets Group. He typically did not discuss cost allowability with the Corporate functions. The Budgets Group relied upon Mr. Pflaumer's advice. (Tr. 3/111-14, 118-19, 121-22, 4/22, 25-26, 60, 5/6, 20, 27, 34-35, 69, 87-88, 106, 152, 10/135-36; *see* GPFF ¶ 21) Mr. Pflaumer was responsible for reviewing the draft CY 2004 Corporate Proposal prepared by the Budgets Group in the A&S Controller's Office. As part of the draft CY 2004 Proposal, the Budgets Group analysts prepared "schedules" that identified the amount of various costs that Raytheon would withdraw from its proposal. (Tr. 5/27-28; GPFF ¶ 22)

13. Raytheon Corporate prepared its CY 2004 indirect cost proposal between January and May 2005. Raytheon's Chief Financial Officer (CFO) and Corporate Controller, Biggs Porter, reviewed the proposal with the A&S Division Controller and the Budgets Group manager and, on 31 May 2005 Mr. Porter certified:

> This is to certify that I have reviewed this proposal to establish final indirect cost rates and to the best of my knowledge and belief:
>
> (1) All costs included in this Corporate 2004 Overhead Cost Submission (Sections 1-9) proposal to establish final indirect cost rates for 2004 are allowable in accordance with the cost principles of the [FAR] and its supplements

13

applicable to the contracts to which the final indirect cost
rates apply; and

(2) This proposal does not include any costs which are
expressly unallowable under applicable cost principles of
the FAR or its supplements.

(App. supp. R4, tab 635 at 3029) The review and certification took between a half hour
and an hour. Raytheon submitted its proposal to the government on or about 2 June
2005. (Supp. R4, tab 271 at 2901, tr. 3/52-53, 60-61, 127-28; GPFF ¶¶ 27, 39)

14. In its 27 April 2006 audit report, DCAA stated that, for CY 2004, Raytheon's
accounting system and related internal controls were "adequate for accumulating,
reporting and billing costs on Government contracts," which was DCAA's highest rating
(supp. R4, tab 271 at 2903; tr. 8/49-50). However, the auditors concluded that
Raytheon's proposal contained expressly unallowable costs that were subject to a "level
1" penalty under FAR 42.709-1(a)(1), including, *inter alia*, costs to design and build an
M&A Support Center Application, aircraft fractional lease costs, and lobbying and
political activity costs (hereafter usually "lobbying" costs), addressed below (*id.* at 2938,
2941, 2946). Raytheon disagrees that the costs were expressly unallowable.

15. Rodger Christiansen, a DCMA cost analyst, was the government's principal
negotiator for Raytheon's CY 2004 Corporate Proposal. He provided recommendations
to then CACO Daniel Dowd concerning the final disposition of the proposal and
testified in his deposition that he drafted the COFD at issue. Neither party called
Mr. Christiansen as a witness. (Tr. 6/202, 204, 211-12, 215-17, 247-48, 7/64-66; *see*
GPFF ¶¶ 42-43; gov't opp'n to app. mot. to strike at 17)

16. On 26 May 2011 CACO Dowd issued a COFD determining that Raytheon
had included $1,410,792 in expressly unallowable costs in its 2004 Corporate Proposal.
The costs included, among several others:

> Outside Legal (Indra/ITECH) -- $53,944
> Recruitment (Recruiting Reminder Items) -- $33,456
> Washington Office (Lobbying Withdrawal) -- $224,925
> Rental Equipment (Corporate Aircraft) -- $399,832
> Outside Services (T.A.B. Associates) -- $98,769
> Outside Services (Genesee) -- $215,613
> Outside Services (Icent LLC Database) -- $200,000

(Supp. R4, tab 306 at 3444; APFF ¶ 42) Based upon the percentage of Raytheon's
cost-type government contracts, provided by Raytheon, the COFD demanded that
Raytheon pay the government $574,192 in allegedly unallowable costs, $574,192 in level

14

1 penalties under FAR 42.709-1(a)(1), and $183,748 in interest, for a total of $1,332,132 (supp. R4, tab 306 at 3442; *see* tr. 5/164, 6/27, 218, 222-23; GPFF ¶¶ 45-46).

17. By letter to CACO Dowd dated 26 June 2011, John G. Panetta, Raytheon's Senior Director of Government Accounting at its corporate headquarters (tr. 5/157), responded to the COFD, stating in part:

> As part of the normal process for submission, audit and negotiation of disputed items the Company historically has been able to come to a mutual agreement with the DCMA regarding the value of adjustments necessary to close out prior years.
>
> ...[I]t appears that your final decision did not take into consideration the appropriateness of assessing or not assessing a penalty and applied a blanket penalty on all costs. In the most recent year for which we have closed out (2001) penalties were not imposed.

(Supp. R4, tab 308 at 3446) Mr. Panetta added that the COFD's payment demand was "significantly overstated" (*id.*). He included a payment of $833,114, based upon negotiations, and included "payment for the unallowable costs [CACO Dowd] sustained or previously agreed to be withdrawn including simple interest, as well as items [Raytheon] considered potentially subject to penalty" (*id.* at 3447). However, Mr. Panetta stated that Raytheon disagreed that other cost categories should have been questioned or subject to penalties. He noted that Raytheon intended to dispute many cost items in the COFD that it had previously agreed to withdraw and which were included in its payment.

18. On 19 August 2011 Raytheon appealed to the Board from the COFD. The Board docketed the appeal as ASBCA No. 57743. The notice of appeal mentioned the total $1,332,132 amount assessed in the COFD and did not exclude any of the cost elements cited by the CACO. However, prior to the hearing Raytheon agreed to withdraw the following of its 2004 Corporate costs, without conceding that they were unallowable, and the government withdrew its associated penalty claims: Indra, Genesee, and Recruiting (Reminder Items). The government also withdrew its claim regarding T.A.B. Associates. (Tr. 9/23-24, 72-74; ex. A-28) The remaining costs at issue in ASBCA No. 57743 are corporate aircraft costs, including aircraft fractional lease costs and costs pertaining to Raytheon's Challenger 604 aircraft; Washington Office lobbying and political activity costs; and corporate consultant costs to design and build an M&A database (supp. R4, tab 271 at 2900-01, 2923-24, 2938, 2941, 2946, 2950; app. supp. R4, tab 635; *see* GPFFs ¶¶ 38-40, GPFF ¶ 41 with app. add.; ex. A-28; tr. 9/22-24).

15

## I. Aircraft Costs

19. Raytheon agreed voluntarily to withdraw the aircraft costs at issue and not to dispute a determination that they are unallowable. However, it disputes that they are expressly unallowable and asserts that, even if they are deemed to be expressly unallowable, a waiver of penalties pursuant to FAR 42.709-5 was warranted. Raytheon alleges that it included the costs inadvertently, despite its exercise of due care. (App. pre-hearing br. at 63; *see* tr. 5/162)

## A. Raytheon's Aircraft Fractional Lease Costs

20. FAR 31.205-46, Travel costs, governs costs of using corporate-leased aircraft. It provided in part when Raytheon's contract was effective in January 2004 and when it entered into an Advance Agreement in December 2003 (below):[4]

> (d) Airfare costs in excess of the lowest customary standard, coach, or equivalent airfare offered during normal business hours are unallowable except when such accommodations require circuitous routing, require travel during unreasonable hours, excessively prolong travel, result in increased cost that would offset transportation savings, are not reasonably adequate for the physical or medical needs of the traveler, or are not reasonably available to meet mission requirements. However, in order for airfare costs in excess of the above standard airfare to be allowable, the applicable condition(s) set forth above must be documented and justified.

> (e)(1) "Cost of travel by contractor-owned, -leased, or –chartered aircraft," as used in this paragraph, includes the cost of lease, charter, operation (including personnel), maintenance, depreciation, insurance, and other related costs.

> (2) The costs of travel by contractor-owned, -leased, or –chartered aircraft, are limited to the standard airfare described in paragraph (d) of this subsection for the flight destination unless travel by such aircraft is specifically required by contract specification, term, or condition, or a higher amount is approved by the [CO]. A higher amount

---

[4] Although numbered differently, FAR 31.205-46 contained similar provisions at the time Raytheon submitted its 2004 Corporate Proposal.

may be agreed to when one or more of the circumstances for justifying higher than standard airfare listed in paragraph (d) of this subsection are applicable, or when an advance agreement under subparagraph (e)(3) of this subsection has been executed. In all cases, travel by contractor-owned, –leased, or –chartered aircraft must be fully documented and justified....

....

(3) Where an advance agreement is proposed (see [FAR] 31.109 [role and requirements of advance agreements]), consideration may be given to the following: [cost, availability, convenience, flexibility, and efficiency factors].

21. During 2003 and 2004, Raytheon maintained one corporate-owned aircraft—a Hawker; one leased aircraft—a Challenger; and it participated in an aircraft fractional lease program, which gave it the right to a fraction of the usage of a pool of private aircraft shared with other fractional lessees. This allowed Raytheon access to aircraft and crew on an as needed basis without the full costs, manpower and administrative tasks attendant to aircraft ownership. (*See* supp. R4, tab 128 at 1728-29, ¶ A.; tr. 3/166-68; 4/115; GPFF ¶¶ 59-60) Raytheon does not contend that its use of aircraft fractional leases was required by contract.

22. On 11 December 2003, then CACO John McGrath issued to Raytheon a "[COFD]/Demand Letter – Penalties for Unallowable Costs (CY 1999)," which assessed $875,212 in penalties and interest on certain costs determined to be expressly unallowable. The CACO assessed level 2 penalties on the cost of Raytheon's private aircraft pursuant to FAR 42.709-1(a)(2). The parties agree that the government penalized Raytheon for failing to remove the cost of using private aircraft from its CY 1999 incurred cost proposal in excess of an agreed-upon limit. Raytheon did not appeal this COFD, and it paid the penalties assessed on the private aircraft costs. (Supp. R4, tab 127 at 1723-25; tr. 5/64-66, 170-72; *see* GPFF ¶ 58) Raytheon disputes the relevance of the 1999 costs to this appeal.

23. In December 2003 CACO McGrath and Raytheon executed an Advance Agreement on the Allowability of Aircraft Fractional Lease Costs (December 2003 Advance Agreement). It provided in part:

I. **PURPOSE**:

....

17

The specific requirements regarding the recovery of aircraft fractional lease costs are set forth in FAR 31.205-46(e). These requirements form the basis for the terms and conditions of this Advance Agreement which authorizes the recovery of travel costs in excess of standard commercial airfares. Pursuant to the criteria established under FAR 31.205-46(e)(3), the Defense Corporate Executive (DCE) has determined that the benefits of the aircraft fractional lease (e.g. timesavings, more effective use of personnel, increased security) outweigh any additional travel costs that may occur from such use. Additionally, this Advance Agreement is also issued to enable the parties to streamline the negotiation process, for the settlement of Raytheon's final overhead/incurred cost claims, by providing a mutually agreed upon procedure for proposing, evaluating, and negotiating the associated aircraft fractional lease costs.

## II. TERMS AND CONDITIONS:

### (a) Aircraft Fractional Lease and Associated Costs

This Advance Agreement is applicable for all the costs associated with an aircraft fractional lease (including rental payments, management fees, hourly rates, fuel, and other fees and related expenses)....

....

### C. Recoverable Aircraft Fractional Lease Costs

Total aircraft fractional lease costs will be reduced for all "unallowable/unallocable trips" which Raytheon will voluntarily withdraw for the purpose of overhead recovery. The balance of the aircraft fractional lease costs will be classified as allowable expenses subject to the application of a sixty percent (60%) disallowance factor. This disallowance factor is applicable to all aircraft fractional lease expenses as described [above].

18

The remaining forty percent (40%) will be considered recoverable aircraft fractional lease costs subject to the results of an "unallowable/unallocable trips" review [by DCAA] as part of its audit of the Company's annual final overhead rate/incurred cost claim.

(Supp. R4, tab 128 at 1728-29; *see* tr. 3/167-68; GPFF ¶¶ 62-68) The December 2003 Advance Agreement and its 60% "disallowance factor" applied to aircraft fractional lease costs incurred by Raytheon from 1 January 2003 through 31 December 2005 and to aircraft fractional lease costs paid by the Raytheon Corporate Office from July 2002 to December 2002 (supp. R4, tab 128 at 1730). The Budgets Group's Senior Manager, Mr. Vilandre, acknowledged that Raytheon was required under the agreement to withdraw aircraft fractional lease costs from its Corporate Proposal that exceeded the 40% recovery rate (tr. 3/171, 173, 175; GPFF ¶ 69).

24. On 1 June 2004 Raytheon submitted its 2003 Corporate Proposal, which contained costs associated with its CY 2003 aircraft fractional lease, including management fees of $559,037, to which it did not apply the then applicable 60% disallowance factor of $335,422, contrary to the December 2003 Advance Agreement. DCAA's 28 February 2005 audit report on the proposal states that the parties agreed that the questioned costs of $335,422 were unallowable. DCAA recommended a level 2 penalty. The report states that DCAA discussed its audit results with Mr. Vilandre; he concurred with DCAA's questioning of the $335,422 in aircraft fractional lease management fees; and DCAA provided him with a copy of its draft report in a final exit conference on 13 December 2004. He received the final report shortly after 28 February 2005. (Supp. R4, tab 244 at 2550-51, 2555, 2579-81; tr. 3/178, 180; *see* GPFF ¶¶ 70-72) CACO Dowd never assessed DCAA's recommended penalties for Raytheon's FY 2002 or 2003 costs. He deemed it too late to do so after he became CACO in December 2006. (Tr. 6/205, 212-14)

25. Kathleen Giovannini, a Consulting Budget Analyst in Mr. Vilandre's Budgets Group, who had served as a budget analyst for 38 years, was responsible for executive aircraft and M&A cost collections and withdrawals in Raytheon's corporate proposals. She had performed executive aircraft expense withdrawals since the 1990's, but the aircraft fractional lease arrangement was new to her and to Raytheon. (Tr. 3/178, 187, 4/106-07, 115, 134-37, 141)

26. A new Chief Executive Officer, William Swanson, had taken over at Raytheon in July 2003 and had brought his fractional leased aircraft with him from Raytheon's Electronic Systems business segment. In late 2003 or early 2004, Ken Eldridge, Raytheon's A&S Division Controller (tr. 4/21), created a cost center for the aircraft to which Flight Operations assigned all of the costs regarding who was being charged for usage, etc. Ms. Giovannini, who was then responsible for the cost center,

19

would gather those costs. However, at the time, and into 2004 when she prepared her portion of the 2004 Corporate Proposal (below), she was unaware that there were aircraft fractional lease management fees and lease expenses that were going to other executive cost centers that had nothing to do with the aircraft. The aircraft fractional leasing company issued three separate invoices per month—one for usage costs, one for management costs and one for lease fees. Ms. Giovannini withdrew 60% of the costs on the usage invoices, which included hourly charges, fuel costs, facilities fees, catering, and landing charges and appeared to her to include all fractional lease costs. She was not aware at the time that there were also lease and management fees. Every other aircraft cost center with which she had worked had consolidated costs in one monthly invoice. The 60% disallowance factor was not applied to the lease and management fees but Ms. Giovannini testified credibly that Raytheon did not knowingly fail to do so. (Tr. 3/179, 186, 193, 196-98, 4/120, 125-26, 130-31, 142-43)

27. Mr. Vilandre did not recall whether he had provided a copy of DCAA's audit report for 2003 to Ms. Giovannini but he stated that he remembered discussing the 2003 problem with her and the need to correct it (tr. 3/180-82). He elaborated:

> A I would have discussed it with [Ms. Giovannini]; I wasn't there when the 2003 overhead proposal was prepared or submitted. So, I told her about the issue and we talked about that we needed to have the issue fixed going forward. And we thought we did fix it in 2004.

> Q Why did you think you had fixed it for 2004?

> A Because the costs came to us in 2003 from a business. They followed the CEO when he came from the business to become the CEO of Raytheon. And we didn't allocate the costs for the fractional program in 2003; they were allocated by the executive aircraft center, which is not what we normally do.

> And we didn't have a cost center for this cost in 2003, so it didn't have its own department. We opened the department for our cost center in 2004 and we thought that the costs were being collected there.

(Tr. 3/182-83)

28. On or about 15 February 2005 Raytheon and CACO McGrath entered into an Advance Agreement on the Allowability of Aircraft Fractional Lease Costs (February 2005 Advance Agreement). The agreement, effective from 1 January 2004

through 31 December 2005, superseded its predecessor. It contained the same provisions quoted above (finding 23), except it increased the disallowance factor from 60 to 66%. Mr. Pflaumer of Corporate Government Accounting sent the agreement on 16 February 2005 to Controller Eldridge for review, distribution and compliance. Mr. Vilandre received a copy before he completed Raytheon's incurred cost submission for 2004. (Supp. R4, tab 243 at 2546, 2548-49; tr. 3/177; *see* GPFF ¶¶ 75-83)

29. Under the February 2005 Advance Agreement, as in the December 2003 Advance Agreement, Raytheon was first to reduce total aircraft fractional lease costs for all unallowable and unallocable trips, which Raytheon would voluntarily withdraw for the purpose of overhead recovery. The balance of the aircraft fractional lease costs would be classified as allowable subject to the application of the new 66% disallowance factor, which applied to all aircraft fractional lease expenses, including *inter alia*, rental payments and management fees. (Supp. R4, tab 243 at 2547-48)

30. Raytheon's 2004 Corporate Proposal, submitted on 2 June 2005, contained costs associated with its CY 2004 aircraft fractional lease, including lease or usage costs and fixed management fees. Raytheon did not apply any disallowance factor to the management fees. For the usage costs, it applied a disallowance factor but did not use the 66% factor called for by the February 2005 Advance Agreement. (Supp. R4, tab 271 at 2941-42, tab 350; tr. 3/185, 4/116, 120; GPFF ¶¶ 83-90)

31. Ms. Giovannini began work on her executive aircraft withdrawals for Raytheon's 2004 Corporate Proposal in about mid to late January 2005 and probably completed it in February 2005. She was aware in 2004 that Raytheon had a fractional lease agreement for an aircraft and she was aware in 2005, when she prepared an "[A&S] Division, 2004 Overhead Submission, Executive Aircraft Withdrawals—Summary," that Raytheon had an Advance Agreement with the government concerning aircraft fractional lease costs (Supp. R4, tab 350; tr. 4/116-17) Ms. Giovannini was not sure when she saw or read the Advance Agreement, who gave it to her or when, or whether she had received the February 2005 Advance Agreement before she completed her 2004 cost submission (tr. 4/119). She kept copies of the Advance Agreements pertinent to the aircraft for which she was responsible for withdrawing costs (tr. 4/117-18, 121-22).

32. Ms. Giovannini believed that she received a copy of the 28 February 2005 audit report for 2003 but she did not know when. She also believed that, in 2004 and 2005, Mr. Eldridge or Mr. Vilandre would have received DCAA's audit reports on Raytheon's indirect cost proposals. Thereafter she received a copy of the portions relevant to her work. She did not believe she received the audit report findings for 2003 before she had completed all of her calculations for 2004 because she would not knowingly have made DCAA's cited error concerning Raytheon's failure to comply with the 2003 Advance Agreement's 60% withdrawal factor. She testified that Mr. Vilandre did not tell her about the audit finding for 2003 before she had completed

her work for 2004. She believed that, if she had known about it, she would have reviewed her withdrawal submission and corrected it herself or with Mr. Vilandre. (Tr. 4/120-22) The government contends that Mr. Vilandre was not credible (gov't reply br. at 17). While neither Mr. Vilandre nor Ms. Giovannini was certain about timeframes and their testimony occasionally suffered from speculation about what he or she "would have" done, the Board nonetheless found Mr. Vilandre to be a credible witness.

33. For her portion of Raytheon's CY 2004 Corporate Proposal, Ms. Giovannini relied upon an aircraft fractional lease invoice sent to her from Raytheon's Flight Operations center. The invoice listed, by user, the flight location and costs. She applied the disallowance factor to all of the costs that were on the invoice and looked at each flight to determine cost allowability. She believed that all of the costs were on the invoice because that was all she received. She was not aware at that timeframe that there were also lease and management fees to consider. (Tr. 4/130-32) Because the 28 February 2005 audit report on Raytheon's 2003 Corporate Proposal noted the omission of the lease and management fees (finding 10), this suggests that Ms. Giovannini did not have her portion of the report at the time of her submission for 2004 or that she overlooked this aspect of the report. Her ignorance of the lease and management fees also suggests that Mr. Vilandre's intended correction of the 2003 problem occurred after she submitted her portion of Raytheon's 2004 Corporate Proposal.

34. Based upon the forgoing, we find that Ms. Giovannini's receipt of the portion of the 28 February 2005 audit report relevant to her work likely occurred after her submission of her material for Raytheon's 2004 Corporate Proposal, which she believed was in February 2005. In any case, similarly to Mr. Vilandre, Ms. Giovannini testified:

> Q So, you don't believe you learned of the audit finding on 2003 until after the 2004 proposal had been submitted?
>
> A Correct. And even if I had, we're talking about 2003. 2003. We believed in 2004, when we created a cost center for the fractional, that everything was taken care of.

(Tr. 4/122)

35. Regarding his review of Ms. Giovannini's "[A&S] Division, 2004 Overhead Submission, Executive Aircraft Withdrawals - Summary" (supp. R4, tab 350), Mr. Pflaumer testified:

22

Q  Can you tell from this schedule, Mr. Pflaumer, whether the management fees for the fractional lease aircraft have been captured?

A  Not specifically.

Q  For purposes of your review of this schedule, did you assume that Ms. Giovannini had taken the necessary steps to apply the disallowance factor to all of the fractional lease costs?

A  In general, or are you still talking about the management fees?

Q  All of the costs, the management fees, the usage fees, the other fees?

A  The assumption would be that, yes, on the top of – where it has the disallowance factor, that that would have been applied to all of the appropriate costs.

(Tr. 5/68-69; *see* GPFF ¶ 23)

36.  In its 27 April 2006 audit report on Raytheon's 2004 Corporate Proposal DCAA questioned $399,832 in aircraft costs. It found them to be expressly unallowable and subject to a level 1 penalty. Of the $399,832, $336,892 were said to be unallowable aircraft fractional lease costs and management fees that had not been reduced by the 60% disallowance factor set in the 2003 Advance Agreement. DCAA erroneously did not cite the then applicable 66% disallowance factor set in the 2005 Advance Agreement. The parties agree that, if it had done so, unallowable aircraft fractional lease management fees would have totaled $350,567 and unallowable aircraft fractional lease usage costs would have totaled $45,360. (Supp. R4, tab 271 at 2941; GPFF ¶¶ 86-91) Mr. Vilandre acknowledged that the problem of Raytheon's not applying the agreed upon disallowance factor was the one that had occurred in 2003 (tr. 3/185).

37.  In his 26 May 2011 COFD on Raytheon's 2004 Corporate Proposal, the CACO assessed level 1 penalties on Raytheon's proposed aircraft fractional lease costs totaling $399,832, consistent with DCAA's 2006 audit report. There has been no COFD claiming an increased amount based upon the 66% disallowance factor, but the government claims the increased amount ($350,567 in unallowable aircraft fractional lease management fees plus $45,360 in aircraft fractional lease usage costs) in this appeal. (Supp. R4, tab 306 at 3444 (Rental Equipment), *see* tab 271 at 2941; *see, e.g.*, tr. 3/211; GPFF ¶¶ 86, 88, GPFF ¶ 91 and app. adds.; gov't br. at 85)

38. In his 26 June 2011 letter to CACO Dowd regarding his final decision, Mr. Panetta advised:

> Rental Equipment ($399,832) – [Raytheon] disagrees with the application of a level one penalty as these costs are not expressly unallowable under a cost principle in the FAR. Furthermore, [Raytheon] views this scenario as warranting a waiver of penalty under 42.709-5(c). [Raytheon's] failure to reduce fractional aircraft costs by the agreed to unallowable factor was an oversight and was inadvertently incorporated into the 2004 incurred cost claim notwithstanding the exercise of due care at that time. To guard against the problem recurring, the Company subsequently established policies, training, and revised practices designed to ensure these costs are properly withdrawn in future claims. As evidence that this process is working as intended, in the last 6 incurred cost claims (2005-2010) these costs have been properly withdrawn.

(Supp. R4, tab 308 at 3447-48)

39. When Mr. Vilandre received DCAA's audit report in 2005 covering the 2003 Corporate Proposal he did not inquire of the business segment that had handled the aircraft fractional lease costs previously to try to determine what all of the costs were. He did not ask the Executive Aircraft Group to provide him with all of the invoices from Flight Operations for the aircraft fractional lease so that he would know what all of the costs were. (Tr. 3/198-99) There is also no evidence that Ms. Giovannini, the key aircraft cost accumulator for purposes of Raytheon's corporate proposals, made any such inquiries. There is no evidence that she asked at any time, even after learning of the errors in the 2003 Corporate Proposal concerning the lease and management fees portion of the aircraft fractional lease costs, about the nature and extent of those costs and how and where they were recorded at Raytheon. Although Raytheon made different mistakes in 2003 and 2004 concerning its aircraft fractional lease costs, in both years it failed to apply the disallowance factors set in the applicable Advance Agreements and to withdraw the resulting aircraft fractional lease costs in dispute from its Corporate Proposals for 2003 and 2004 (tr. 3/185; GPFF ¶ 95 and app. add.). We find that Raytheon's aircraft fractional lease cost withdrawal errors were inadvertent (*see, e.g.*, finding 26), but we do not make an ultimate finding concerning due care because we conclude (below) that the aircraft fractional lease costs were not expressly unallowable under a FAR cost principle or agency FAR Supplement and, thus, were not subject to penalty or issues pertaining to penalty waiver.

24

## B. Raytheon's Challenger 604 Aircraft Costs

40. The second relevant aircraft cost at issue in DCAA's 27 April 2006 audit report on Raytheon's 2004 Corporate Proposal and in CACO Dowd's 26 May 2011 COFD involved the $62,940 balance of the $399,832 in aircraft costs DCAA found to be unallowable and subject to a level 1 penalty. That balance pertained to Raytheon's costs to lease a private aircraft, the Challenger 604. As DCAA described it:

> The remaining $62,940 represents the difference between Hawker and Challenger aircraft advance agreements. The 62 percent disallowance contained in the Hawker aircraft advance agreement was also used to develop the claimed amounts for the Challenger aircraft due to the lack of a Challenger advance agreement. An advance agreement was subsequently agreed to for the Challenger aircraft that contained a 66 percent disallowance factor. The $62,940 adjustment represents the application of the additional disallowance contained in the Challenger advance agreement.

(Supp. R4, tab 271 at 2941)

41. On 1 April 2004 Raytheon entered into a lease for the Challenger aircraft, which entered service on 29 April 2004. It was used exclusively by Raytheon. By letter to CACO McGrath dated 23 March 2005, Raytheon sent a proposed Advance Agreement to authorize the recovery of travel costs in excess of standard commercial airfares, as with its aircraft fractional lease and its company-owned Hawker aircraft. It proposed a 35% recovery rate, or 65% disallowance factor. (App. supp. R4, tab 629; supp. R4, tab 248 at 2663; tr. 3/213; GPFF ¶ 108)

42. On 20 April 2005 DCAA issued an audit report on Raytheon's Advance Agreement proposal. DCAA concluded that Raytheon's assumption of an 80% executive productivity rate during flight was excessive and unreasonable. DCAA applied a 50% productivity rate and arrived at an overall 32% recovery rate, or 68% disallowance factor. (Supp. R4, tab 248 at 2660, 2663)

43. By the time of its 2 June 2005 2004 Corporate Proposal, although it was negotiating with DCMA, Raytheon did not yet have an Advance Agreement with the government concerning the Challenger aircraft. Ms. Giovannini prepared the 2004 recoverability analysis for the Challenger 604 aircraft in January and February 2005. In consultation with Mr. Vilandre, as a "placeholder" rate, she used the same 38% recoverability rate, or 62% disallowance factor, contained in Raytheon's Advance Agreement covering the Hawker aircraft it owned, deeming that to be solid precedent.

25

Raytheon planned to "true-up" to the rate to which the parties ultimately agreed. (Tr. 3/214, 216-18, 221, 5/77-78 (Pflaumer dep. testimony); GPFF ¶ 114 with app. add.)

44. In October 2005 Raytheon and CACO McGrath executed an Advance Agreement on the Allowability of Raytheon Challenger Aircraft Costs which required Raytheon to apply a 66% disallowance factor to its Challenger costs after deducting unallowable/unallocable trips, resulting in a 34% recovery rate. The agreement applied to costs from 1 January 2004 through 31 December 2005. Raytheon represents that, during final indirect cost rate negotiations, it agreed to withdraw the difference between its "placeholder" recovery rate and the recovery rate specified in the October 2005 Advance Agreement. It does not challenge the unallowability determination for what it states to be $78,949, but it disputes the government's penalty assessment. (Supp. R4, tab 260; tr. 3/223-24, 6/235-36; GPFF ¶¶ 116-17; APFF ¶ 54; app. br. at 50, discussing GPFF ¶ 118)

## II.    Lobbying Costs

45. FAR 31.205-22, Lobbying and political activity costs, provides in subparagraph (a) that "[c]osts associated with the following activities are unallowable:" The list includes certain lobbying and political activities, which are subject to exceptions covered in subparagraph (b). Subparagraph (c) states:

> When a contractor seeks reimbursement for indirect costs, total lobbying costs shall be separately identified in the indirect cost rate proposal, and thereafter treated as other unallowable activity costs.

46. FAR 31.201-6(e)(2) provides that:

> *Salary expenses of employees who participate in activities that generate unallowable costs shall be treated as directly associated costs to the extent of the time spent on the proscribed activity*, provided the costs are material in accordance with subparagraph (e)(1) above (except when such salary expenses are, themselves, unallowable). The time spent in proscribed activities should be compared to total time spent on company activities to determine if the costs are material. [Emphasis added]

47. Raytheon's General Policy and Procedure No. 23-3045-110, "IDENTIFYING AND REPORTING LOBBYING ACTIVITY COSTS," effective 13 December 1984, provides at ¶ 5.1.2, Associated Lobbying Activity Costs, that:

26

a. The lobbying activity costs defined above [under ¶ 5.1.1, describing unallowable lobbying activity costs] include the applicable portions of salaries of employees and fees of individuals or firms engaged in lobbying activity on behalf of Raytheon....

(Supp. R4, tab 100 at 1001) Mr. Vilandre identified labor costs as costs associated with Raytheon's employees performing unallowable lobbying activities and opined that, under FAR 31.205-22(a), those labor costs are unallowable. Mr. Vilandre also acknowledged that, in the above policy, Raytheon identifies salary as a cost associated with unallowable lobbying activity. (Tr. 3/63-64, 66) Raytheon's Company Policy No. 6-RP, "Overhead and G&A Rates for Accounting and Provisional Billing Purposes (Excluding Unallowable Costs)," effective 26 June 2002, provides at ¶ 6.2 that:

Unallowable costs are to be identified, accounted for separately, and excluded from recoverable accounts for determining final recoverable rates. Unallowable costs are expressly unallowable costs, costs which are agreed with the government [COs] to be unallowable costs, and directly associated costs. Examples of expressly unallowable costs include...lobbying....

(Supp. R4, tab 111 at 1233) Messrs. Vilandre and Panetta acknowledged that this policy states that lobbying is an expressly unallowable cost (tr. 3/67, 5/162).

48. Raytheon's lobbying activities are concentrated at its Washington Office, where its employees record the time they spend on lobbying. Raytheon has an embedded "Finance Department" there, which it describes as a "Corporate A&S Budget Analyst," primarily responsible for assessing cost allowability. (Supp. R4, tab 352 at 5188-89; tr. 4/59-60, 5/87, 6/131-32, 200; undisputed portion of APFF ¶ 61)

49. In 2004, to withdraw its unallowable lobbying costs, Raytheon made a "good faith estimate" of the hours its Washington Office employees spent on covered lobbying activities, based upon the Lobbying Disclosure Act of 1995, 2 U.S.C. § 1601 *et seq.* (2004), which in 2004 required that companies engaged in lobbying report to Congress "a good faith estimate of the total expenses that the [company] and its employees incurred in connection with lobbying activities during the semiannual filing period," and stated that estimates over $10,000 were to be "rounded to the nearest $20,000," 2 U.S.C. §§ 1604(b)(4) and (c)(1).[5] For purposes of these appeals, the government does not challenge Raytheon's methodology. (Tr. 7/253-54, 8/34; undisputed portion of APFF ¶ 61) To create a disallowance factor for withdrawing

---

[5] Section 1604 was amended in 2007 but the amendments are immaterial to this decision.

unallowable lobbying costs from its 2004 Corporate Proposal, Raytheon calculated a ratio. The numerator was the total annual disallowed lobbying hours based upon timesheets. The denominator—1,880 labor base hours for each employee included in the numerator—was based upon a standard 2,080-hour work year per lobbyist (40 hours per week times 52 weeks), minus paid time off (holiday and vacation). (Supp. R4, tab 271 at 15571, tab 361; tr. 4/70-74, 78)

50. Ms. Donna Ferrero, a Consulting Budget Analyst in Mr. Vilandre's Budgets Group at Raytheon's Controller's Office (*see* supp. R4, tab 271 at 15571), was responsible for developing the disallowance factor used to withdraw lobbying costs from Raytheon's 2004 Corporate Proposal. She first became responsible for that task when she prepared the lobbying withdrawal for the 2001 Corporate Proposal. She did not have written instructions. She met with her predecessor and her supervisor, who explained the purpose of, and the steps required to calculate, the disallowance factor. (Tr. 4/52, 57-58)

51. To calculate the lobbying disallowance factor for 2004, Ms. Ferrero reviewed her prior year's spreadsheet; talked to Greg Reynolds, a supervisor in her department who assembled Raytheon's lobbying disclosure reports to Congress; and talked to individuals in the Washington Office. She first reviewed a report by Mr. Reynolds. Judy Pauletich, a legislative research analyst at the Washington Office (supp. R4, tab 271 at 15571), provided the lobbying information to him through time sheets and cover memoranda. He sent a copy of his report of lobbying activities for 2004 to Ms. Ferrero and others at Raytheon on 1 February 2005. It did not include the time sheets and Ms. Ferrero did not see them in making her lobbying withdrawal calculations for the 2004 Corporate Proposal. (Supp. R4, tabs 148, 242; tr. 4/65-69, 82; APFF ¶ 64)

52. On 1 July 2004 Ms. Pauletich sent "Lobbying Reports" (timesheets) to Mr. Reynolds. The cover memorandum noted that a Mr. Hickey's employment had terminated on 23 April 2004 and a Ms. Norton's had terminated on 11 June 2004. It stated that, as Ms. Pauletich received missing reports, she would fax them to Mr. Reynolds. Later in July 2004, she sent Lobbying Reports to him for four individuals. On or about 1 November 2004 and 31 January 2005, respectively, Ms. Pauletich sent Third and Fourth Quarter Lobbying Reports to Mr. Reynolds. In the Fourth Quarter report the period covered for most of the listed employees was October through December 2004, but for a Mr. Lynn it was October through November 2004 and for a Ms. Donalty it was November 2004. The report noted that Ms. Donalty had been hired on 8 November 2004. (Supp. R4, tab 148 at 1988, tabs 149-50, 194, 241; tr. 4/67) Mr. Reynolds' lobbying report, used by Ms. Ferrero, did not include Ms. Pauletich's notes about employees' work terminations and hiring (supp. R4, tab 242). The significance of the fact that three Washington Office employees had worked for only part of 2004 was that they "were not to receive a full year's...labor base allocation" (APFF ¶ 64).

53. Ms. Ferrero's second step in computing the lobbying disallowance factor was to look at a spreadsheet in Mr. Reynolds' report and the hours listed for the named individuals. If anyone had a zero balance she would consult with Mr. Reynolds to determine the reason. Next she would calculate the disallowance factor based upon the foregoing ratio. Mr. Hickey and Ms. Norton were shown with a zero balance for the second half of 2004. Ms. Ferrero highlighted their names and consulted with the Washington Office, who informed her that they had both left the company. (Supp. R4, tabs 245, 361 at 418; tr. 4/70-72) She intended to reduce the denominator in the ratio used for lobbying withdrawals with respect to them, as she had in similar situations for all previous years she had worked on this task, but she stated "for some reason, this year in 2004 I missed it" (tr. 4/73). Ms. Ferrero did not notice that Mr. Reynolds' spreadsheet also showed zero hours for the first half of 2004 for Ms. Donalty and Mr. Lynn. She subsequently learned that Mr. Lynn had lobbying hours in the first half of 2004. She did not know why they were not reported. (Supp. R4, tab 242 at 2544; tr. 4/74-77)

54. In addition to the proration errors, Ms. Ferrero's disallowance factor calculations erroneously included hours for work by CEO Swanson. He should not have been included because his labor hours were withdrawn elsewhere. The effect of including his hours in the lobbying schedule, when a minimal amount of his time was spent on unallowable lobbying, was that this understated the percent of time that the Washington Office as a whole was working on unallowable cost matters. (Supp. R4, tab 361; tr. 4/79-83, 99) Ms. Ferrero did not make this error in her submittals for 2003 and 2005, but it was something she "missed in 2004" (tr. 4/80).

55. The lobbying disallowance factor calculated by Ms. Ferrero was 19%. From the total costs of its Congressional Relations Cost Center (apparently also referred to as Governmental Cost Center, Government Relations Department, or Business Development Group) Raytheon subtracted all expenses coded as unallowable, leaving a recoverable amount, to which it applied the 19%, resulting in the amount it would withdraw from its overhead proposal. (Supp. R4, tab 271 at 15571, tab 362 at 6083; tr. 3/231, 4/72, 78-79, 83)

56. In its 27 April 2006 audit report DCAA questioned $242,655 in lobbying and political activity costs incurred by Raytheon's Congressional Relations Cost Center and included in Raytheon's 2004 Corporate Proposal. DCAA found that Raytheon did not have time logs for three lobbyists who were engaged in political activities, totaling 518 disallowed lobbying hours, and consequently it did not withdraw the related costs from its incurred costs. Also, time logs from six other lobbyists were not accounted for correctly due to time log misinterpretations, omissions and math errors, resulting in 501 disallowed lobbying hours. Lastly, Raytheon understated its voluntary withdrawal by including a full year of hours in its base of total available hours for three lobbyists who were employed for only part of a year. DCAA found the costs to be expressly unallowable under FAR 31.205-22 and subject to a level 1 penalty. (Supp. R4, tab 271 at 15548, 15570-72; ex. A-18)

29

57. By email to DCAA of 13 December 2007, Mr. Vilandre stated in part:

> After reviewing the calculations provided by DCAA relative
> to the lobbying costs noted resulting from missing time
> sheets for three employees, time sheets for six employees
> that were not accounted for correctly, and the adjustment in
> hours for three employees who worked for less than a full
> year, we agree that the CY 2004 lobbying withdrawal was
> understated by $242,655.

(Supp. R4, tab 290 at 3198)

58. Ms. Ferrero always tried to do her best but she realized she had made some errors. After DCAA's audit report on the 2004 Corporate Proposal, Mr. Vilandre and Ms. Ferrero improved the methodology by which Raytheon's lobbying withdrawal was prepared. Instead of relying upon and matching Raytheon's Congressional lobbying reports, Ms. Ferrero received the timecards from Raytheon's Business Development Group and reviewed them herself. (Tr. 3/232, 4/83, 89)

59. During negotiations regarding the 2004 Corporate Proposal, Raytheon proposed a new calculation of unallowable lobbying costs at $224,925, which DCAA and DCMA accepted and was the amount stated by CACO Dowd in his 26 May 2011 COFD (see R4, tab 306 at 3444; tr. 6/119-21; GPFF ¶ 141; finding 16).

60. In his 26 June 2011 letter to CACO Dowd, Mr. Panetta advised:

> Washington Office ($224,925) – [Raytheon] disagrees with
> the application of a level one penalty as these costs are not
> expressly unallowable under a cost principle in the FAR.
> Our disagreement with the DCAA centers around the
> adequacy of the supporting documentation for our lobbying
> withdrawal and that alone does not make the costs expressly
> unallowable. Although we have agreed to withdraw a
> portion of the Washington Office costs, we did not agree to
> withdraw them on the basis of their being expressly
> unallowable and therefore subject to penalty.

(Supp. R4, tab 308 at 3448)

61. During his litigation preparation, James Higgins, a DCAA auditor who had audited Raytheon's 2004 lobbying withdrawal proposal (tr. 6/50-51), discovered that he had made or might have made errors in questioning the original $242,655 in lobbying

costs. First, at the time of Mr. Higgins' audit he was missing a timesheet for 102 hours of Ms. Donalty's time in December 2004 and he questioned that amount. He later received the timesheet and added the 102 hours into his calculations, without considering that it was possibly the same 102 hours already included by Raytheon but previously unsupported. It might not have been correct to add those hours back in. (Tr. 6/105-06, 120-21, 169) Raytheon did not attempt to show at the hearing that it had included Ms. Donalty's hours in its original lobbying calculation. Secondly, Mr. Higgins acknowledged that he mistakenly questioned 32 hours of weekend time that should not have been treated as unallowable (tr. 6/168-69). Lastly, Mr. Higgins acknowledged that Raytheon withdraws unallowable costs in other schedules before computing its lobbying withdrawal and that, because he did not audit the other schedules, he could not testify conclusively that 252 lobbyist hours included in his calculation of Raytheon's alleged underwithdrawals were not withdrawn elsewhere, hypothetically resulting in double counting. (Supp. R4, tab 363; tr. 6/154-65) He did not think that had occurred, however, because DCAA examined the hours that make up an individual's payroll and, if Raytheon prepared its financial statements according to generally accepted accounting principles, salaries would not have been included in Raytheon's cost elements referred to by the government, described as "other" (tr. 6/63-64). Raytheon did not offer evidence that DCAA had double counted 252 hours.

62. Raytheon disputes the amount of unallowable lobbying costs, but does not contest the government's unallowability conclusions in general. While it agreed to withdraw the costs, it disputes that any portion was expressly unallowable. It further contends that the unallowable costs were included in its 2004 Corporate Proposal inadvertently, despite its exercise of due care, and the CACO erred in not granting it a penalty waiver. (APFF ¶ 60; undisputed portion of GPFF ¶ 119, GPFF ¶¶ 120-22)

Icent Database Costs

63. FAR 31.205-12, Economic planning costs, provides in part:

(a) This category includes costs of *generalized long-range management planning that is concerned with the future overall development of the contractor's business* and that may take into account the eventual possibility of economic dislocations or fundamental alterations in those markets in which the contractor currently does business. *Economic planning costs do not include organization or reorganization costs covered by 31.205-27.*

(b) *Economic planning costs are allowable* as indirect costs to be properly allocated. [Emphasis added]

31

64. FAR 31.205-27, Organization costs, provides in part that:

    (a) Except as provided in paragraph (b) of this subsection [inapplicable], expenditures *in connection with-* (1) *planning* or executing *the organization or reorganization of the corporate structure of a business, including mergers and acquisitions,...* (3) raising capital (net worth plus long-term liabilities), *are unallowable.* Such expenditures include but are not limited to incorporation fees and costs of attorneys, accountants, brokers, promoters and organizers, management consultants and investment counselors, whether or not employees of the contractor. Unallowable "reorganization" costs include the cost of any change in the contractor's financial structure, excluding administrative costs of short-term borrowings for working capital, resulting in alterations in the rights and interests of security holders, whether or not additional capital is raised. [Emphasis added]

65. FAR 31.205-38, Selling costs, provides in part:

    (a) "Selling" is a generic term encompassing all efforts to market the contractor's products or services, some of which are covered specifically in other subsections of 31.205. Selling activity includes the following broad categories:

    ....

    (4) Market planning.

    ....

    (b)...*Market planning involves market research and analysis and generalized management planning concerned with development of the contractor's business. The allowability of long-range market planning costs is controlled by the provisions of 31.205-12.* Other market planning costs are allowable to the extent that they are reasonable and not in excess of the limitations of subparagraph (c)(2) of this subsection. [Emphasis added]

66. Raytheon's 2004 Corporate Proposal included $200,000 paid to Icent, LLC. In its 27 April 2006 audit report DCAA stated that the payments were "to design and build a [M&A] Support Center Application intended to harmonize [M&A] activity" (supp. R4, tab 271 at 2938). DCAA questioned the costs as expressly unallowable M&A costs, subject to a level 1 penalty. CACO Dowd claimed those costs, plus a level 1 penalty and interest, in his 26 May 2011 COFD (supp. R4, tab 306).

67. By letter of 29 October 2003 to Charles A. Stott, then Raytheon's Vice President of Corporate Development (tr. 4/157), Icent President James Joyce described the "deliverables and associated business terms" for a joint Raytheon and Icent IT project to "design and build a [M&A] Support Center Application" that:

1. Will permit the sharing of data and analysis across Raytheon.

2. Will create a common fact base for [M&A] activity.

3. Will decrease the [amount of] time and resources required to complete screening and analysis of [M&A] candidates.

4. Will harmonize [M&A] activities across Raytheon.

5. Will improve the [M&A] process cycle time and communications.

(Supp. R4, tab 124 at 1625) Mr. Joyce named Raytheon's "Corporate Business Development, the Business Unit [M&A] people and Corporate Development" as the "primary users of the [M&A] Resource center" (id. at 1626). The M&A database was to have a "design required to support fast-paced deal activity" (id. at 1627).

68. Raytheon's Corporate Development department was responsible for working with its business units in strategic development and growth opportunities, including strategic analysis of a business' capabilities to market its products and services to the government and function in government work. Where there were gaps in business' capabilities, Corporate Development would work with them to determine the right ways to fill the gaps, either through, inter alia, internal investment, research and development, licensing of intellectual property (IP), partnerships or acquisitions. This process was known as "gap analysis" (tr. 4/247). Working with Raytheon's businesses on M&A and divestitures was not Corporate Development's primary role but was part of its work to find strategic growth initiatives. (Tr. 4/246-47)

33

69. Year to year, in withdrawing unallowable M&A costs, Ms. Giovannini withdrew the majority of Corporate Development's hours. In CY 2004 Raytheon determined that over 8,000 hours of the 6 professional employees working in Corporate Development were unallowable organizational costs under FAR 31.205-27. (Supp. R4, tab 390; tr. 4/148; GPFF ¶ 157)

70. At some point, Mr. Stott gave approval for Icent to begin to design and build an M&A database (tr. 4/161, 165; GPFF ¶ 165). David Scanio, a junior associate within Corporate Development, was Raytheon's primary coordinator with Icent. He prepared a PowerPoint presentation entitled "M&A Resource Center," dated 23 September 2003, which he sent to Raytheon personnel, including Mr. Stott, on 3 October 2003. It memorialized the intent of the M&A Database project. (Supp. R4, tab 122 at 1611; tr. 4/163-64, 219; GPFF ¶ 166) Mr. Scanio's presentation described the M&A Resource Center as "[f]acilitat[ing] and streamlin[ing] all M&A processes and interactions company wide" (supp. R4, tab 122 at 1621). The presentation included the following Summary:

- Keep the hopper full...Robust opportunity pipeline

- Have the ability to act quickly on attractive candidates

- Use M&A to achieve better then [sic] average growth

- Need multiple small to mid-size deals to move the needle

- Use the M&A Resource Center to establish a predictable pattern of deals, a solid process and robust opportunity pipeline

- Improve the acquisition process and achieve our desired objectives

(*Id.* at 1623)

71. Icent's draft document for Corporate Development dated 16 January 2004— Functional Requirements Specification and Preliminary Design – Draft (Specifications Document)—set forth the basic requirements for the M&A database (supp. R4, tab 131 at 1755). The Specifications Document described its purpose in part as follows:

Raytheon has retained [Icent] to assist in developing a more efficient enterprise M&A strategy and process, with the

34

specific goal of helping Raytheon to decrease the amount of
time and effort required to identify and evaluate strategic
M&A opportunities while increasing the value of these
activities.

(*Id.* at 1761)

72. The Specifications Document described three business processes "at the
heart of" the M&A database: the accumulation of market and gap analysis; the
acquisition process; and the divestiture process (supp. R4, tab 131 at 1764). Regarding
market analysis, the Specifications Document stated in part:

> Market analysis is performed by individual business units.
> In many cases, the information captured in the database
> during this phase is pulled directly from business unit
> strategic plans and other work products generated during the
> normal course of business. *In all cases (and in a distinction
> from the other processes outlined in this document), this
> information is not target or candidate specific.* Instead, the
> information captured here relates more broadly to market
> segments, trends, and business unit strategies. The
> functionality to support this accumulation is most similar to
> that of a modern library.

(*Id.*) (Emphasis added)

73. Regarding the acquisition process, the Specifications Document stated in part:

> In addition to performing market analysis, business units
> will also create gap analysis documents on an annual basis.
> Each of these gap analyses will be related to specific
> markets....
>
> ....
>
> *With the candidate identification phase, the focus of the
> M&A process shifts from a market-centric view to one which
> is oriented around specific acquisition candidates. This
> phase of the process moving forward happens on a
> continuous basis,* as well, as opposed to the annual and
> quarterly cycles associated with the market assessment and
> gap analysis phases.

The candidate identification phase begins with the creation of a **candidate master document**, which both fits the company into a standard set of taxonomies (including market, gap, and value information) as well as captures limited qualitative information *about the targeted company.* An additional checkbox field here will allow an early indication of whether a particular company is in play, or if its interest in being acquired will have to be determined separately.

(Supp. R4, tab 131 at 1766) (Italicized emphasis added)

74. Among other things addressing M&A activities and "targets," the Specifications Document referred to: a person or team "responsible for moving the candidate forward through the process;" "contact information for relevant individuals associated with the deal;" M&A Committee review meetings "regarding specific targets;" and a "qualified target company" (supp. R4, tab 131 at 1766-68). The document contemplated re-use of existing application technology, including from Raytheon's IP Center database (*id.* at 1773, 1789).

75. Mr. Stott described the Icent project as designed to help Raytheon's businesses "understand the [IP] content that they had within their divisions" (tr. 4/161). He acknowledged that the intent was that there would be some use of the database in a transaction (tr. 4/231).

76. Ultimately Raytheon terminated Icent's design and build of the M&A Application prior to completion for lack of support (tr. 4/212; GPFF ¶ 172).

77. Icent submitted an invoice dated 10 January 2003 (in context, should have been 2004) in the amount of $100,000 for "December professional fees for the [M&A] Resource Center," and an invoice dated 10 March 2004 in the amount of $100,000 for "February professional fees for the [M&A] Resource Center." Mr. Stott approved payment on 16 January 2004 and 17 March 2004, respectively. (Supp. R4, tabs 115, 139)

78. In Mr. Stott's view the $200,000 in costs were allowable. He agreed with the allegation in Raytheon's second amended complaint that "[a]ll of the costs associated with Icent's work for Raytheon in CY 2004 were in support of economic planning that occurred far in advance of any unallowable [M&A] acquisition planning or activity" (supp. R4, tab 325, ¶ 92; tr. 4/229, 241-43). He reasoned that, while Raytheon's Corporate Development personnel were intended to be some of the primary users of the Icent database, the costs were incurred in developing a tool; they were not associated with any specific transaction; and Icent's work involved strategy, data

collection, inventory warehousing and the like (tr. 4/230-31, 242). The database "never saw the light of day" and "never got used" (tr. 4/243).

79. Joseph Danaher, a Budgets manager for Raytheon's Corporate Administrative Services, who, at the time, had twenty years' experience in finance and government accounting matters, and relevant training and course development experience, was responsible for preparing the "outside services" withdrawal schedule for Raytheon's 2004 Corporate Proposal. During Mr. Danaher's confer and review process, the Icent invoices were flagged three or four times. Mr. Pflaumer, then of Raytheon's Government Accounting Group, had flagged them for further review. Mr. Danaher reviewed Raytheon's Guidelines concerning unallowable costs and concluded that the costs were allowable because they were not for a specific M&A activity. Mr. Pflaumer agreed. Mr. Danaher did not speak to anyone from Corporate Development. (Tr. 8/6-9, 13-15, 17; ex. A-26)

80. Raytheon's FAR Part 31 Guidelines, as of 31 August 2004, Revision No. 2, provided concerning Acquisition, Merger, Divestiture and Other "Organization" Costs:

> *Unallowable acquisition costs commence with the submission of an indicative offer. Unallowable divestiture costs commence when the decision to "go to market" with the offering materials is made. Commencement of unallowable merger costs should be discussed with business segment or Corporate Counsel. These unallowable costs end at the completion of the final balance sheet adjustment for the transaction. The unallowable cost categorizations are applicable to both Business and Corporate personnel.*

(Supp. R4, tab 158 at 2116) The Guidelines leave it indefinite as to whether these costs should be claimed.

81. Raytheon's FAR Part 31 Guidelines further state that the following Acquisition, Merger, Divestiture and Other "Organization" Costs are to be claimed:

> A general review of other companies as part of marketing strategy or strategic planning activities (e.g. economic planning) including preliminary discussions and advice about the advisability of [M&A] *prior to identification of a specific opportunity*. This also includes technical review, review of structure, facilities and modes of operation.

(Supp. R4, tab 158 at 2117) (Emphasis added)

82. Raytheon's Company Policy No. 121-RP, dated 2 November 2004, entitled "Mergers and Acquisitions," states in part:

> Relating to costs associated with [M&A], all Businesses must establish and maintain adequate internal controls necessary to ensure compliance with applicable [FAR] and [CAS] Board rules and regulations. *Organizational costs associated with [M&A] are generally unallowable. Unallowable acquisition costs commence with the submission of an indicative offer. These unallowable costs for [M&A] end at the completion of the final balance sheet adjustment for the transaction.*

(Supp. R4, tab 196 at 2288, ¶ 5.7) (Emphasis added)

83. According to Mr. Stott, at one point Raytheon tried to establish identifying targets as one of its organizational objectives but was not "able to use that as a good objective for the organization" (tr. 4/184). He acknowledged that the database to be developed by Icent was to be for Raytheon's use in tracking that information, but he denied that it was "specific targeted information" (tr. 4/184-85).

84. Regarding M&A and divestitures costs, Paul Bailey, Raytheon's Director of Corporate Development (tr. 4/245), agreed with government counsel's characterization that "Raytheon puts a line in the sand on what's unallowable and what's allowable with respect to corporate development business" (tr. 4/257). Mr. Bailey's Corporate Development office worked with Raytheon's Government Accounting personnel to establish what Mr. Bailey described as "the bright line test" (tr. 4/257-58).

## Non-Waiver of Penalties

85. Negotiations on Raytheon's 2004 Corporate Proposal were completed in 2008-09 (tr. 6/217). No penalties had been assessed on Raytheon's Corporate Proposals for 2001, 2002, or 2003 (ex. A-12). Penalties were not raised by either party in the negotiations for 2004 (tr. 5/165, 169, 6/218). CACO Dowd agreed with Raytheon that, under FAR 42.709-5, a CO is obligated to consider waiving penalties prior to assessing them, whether or not the contractor requests a waiver (tr. 7/58).

86. The 26 May 2011 COFD, assessing penalties against Raytheon, was issued about five days before the six-year anniversary of Raytheon's submission of its 2004 Corporate Proposal. CACO Dowd stated that, due to "statute of limitations concerns," he "needed to move out and issue a penalty determination before the government would lose its rights to a recoupment of money...[for] the penalties" (tr. 6/218).

38

87. Regarding penalties, CACO Dowd believed he needed to "consider everything out there," including matters raised in audit reports issued after 2004 and events that post-dated Raytheon's CY 2004 incurred cost submission (tr. 7/50, 117). Mr. Christiansen, DCMA's chief negotiator with Raytheon, who apparently was involved in drafting the COFD (finding 15), testified in his deposition that alleged CAS 405 noncompliances, which apparently occurred after Raytheon submitted its 2004 Corporate Proposal, were considered in assessing the penalties in the COFD. *See Raytheon I,* 16-1 BCA ¶ 36,335 at 177,143. In interrogatory responses concerning this appeal the government named factors upon which it alleged CACO Dowd relied in declining to waive penalties. At first it listed matters occurring in 2006 and thereafter. In supplemental responses the government cited two 2011 COFDs by CACO Dowd stated to cover matters occurring since 2002 and 2004 (*see* finding 88; *Raytheon I*). CACO Dowd did not remember whether he had contributed to the interrogatory responses (tr. 7/21).

88. On 10 January 2011, CACO Dowd had issued a COFD based upon a DCAA 24 September 2007 CAS 405 audit report concerning incentive compensation in connection with alleged expressly unallowable activity during CYs 2002-2005 (supp. R4, tab 285 at 3154-55). Further, while a CAS 415 (Accounting for the Cost of Deferred Compensation) audit had been "dispositioned" (tr. 6/256, 263), the government's concerns later evolved into CAS 405 matters addressed in a 2 June 2011 COFD on dividend equivalents, which was based upon a 17 July 2008 audit report covering 1 January 2004 through 31 December 2006 (ex. G-3; tr. 6/255-57, 263-64). CACO Dowd considered these two alleged CAS noncompliance matters in reaching his 26 May 2011 final decision on the 2004 Corporate Proposal because they were both being addressed at about the same time he issued that decision and they reflected problems DCMA perceived Raytheon had with its internal controls (tr. 7/19).

89. According to CACO Dowd, Raytheon's payment to the government for dividend equivalent issues had demonstrated to him that the company had conceded a problem. However, Raytheon did not make such a payment until 5 July 2011, after his 26 May 2011 decision. On cross-examination CACO Dowd acknowledged that he did not know prior to the payment whether Raytheon would pay or not and the payment could not have influenced his decision. (Tr. 6/252, 7/27, 40-41; ex. A-20)

90. Additionally, CACO Dowd stated that he was influenced by issues affecting Raytheon's indirect costs and ODC (other direct costs) systems raised in audits issued from 2008 through 2010 that reported upon alleged matters that occurred in 2006 and later. He believed they were relevant on the ground that they showed Raytheon was not "scrubbing out all the unallowable dollars" in its incurred cost submissions (tr. 7/51) and that there was a "good chance" that the issues addressed had existed in earlier time frames as well (tr. 7/52). (App. supp. R4, tab 701 at 4227-28; tr. 7/50-51) *See Raytheon I,* 16-1 BCA ¶ 36,335 at 177,144.

91. Regarding waiver, CACO Dowd testified:

> Q   ....
>
> Can you tell me, Mr. Dowd, in considering whether Raytheon could satisfy you that the [waiver criteria in FAR 42.709-5(c)(1)] are met, what factors did you consider?
>
> A *First of all, I considered each of the ten-odd costs right there, that I penalized them...whether they met the criteria per the FAR....*
>
> Secondly, we had two [CAS] 405 noncompliances out there that we were addressing, the first one being it was for dividend [equivalents]. You know Raytheon conceded that and ultimately paid the government...for dividend equivalents. I believe it started roughly in the 2006 time frame forward and I want to say that it was for the 2004 to 2006 long-term [performance] plan I believe is how Raytheon identifies it.
>
> But anyway, I issued a demand letter to them for those dividend equivalents and Raytheon paid them. So, that concerned me.
>
> We have another CAS 405 that issued in the same time frame for what I called incentive compensation. It was Raytheon pulled out the labor and some fringe costs for this unallowable activity that they pulled out of their incurred cost submission but they didn't pull out the associated incentive compensation associated with that.

(Tr. 6/252-53) (Emphasis added) At this point Raytheon moved to strike CACO Dowd's testimony as inconsistent with alleged judicial admissions by the government in discovery. On 29 March 2016 the Board denied that motion and granted the government's cross motion to strike excerpts from an unrelated Court of Federal Claims proceeding proffered by appellant. *Raytheon I.*

92. Regardless of CACO Dowd's reliance upon some matters that occurred after Raytheon's submission of its 2004 Corporate Proposal, he recalled specific contemporaneous costs in the proposal that concerned him, including aircraft fractional

40

lease costs, in particular. Other costs, including lobbying costs, also concerned him. Along with the aircraft costs, lobbying costs were "significant issues" to him (tr. 7/48).[6] In view of our disposition of the aircraft cost issue, below, we do not make further findings regarding it. Concerning lobbying costs, CACO Dowd recalled that:

> The other costs that concerned me was [sic] the lobbying and political activity cost. In 2004, Raytheon – there was over 1,000 hours that Raytheon didn't account for. I think that was [attributed] to some missing time sheets, some errors and things of that nature. And again, in my mind, if they had the adequate oversight in place, that probably should have been caught right there.

> ....

> ...[T]hey all were a determining factor in my mind that Raytheon did not meet (c)(1) and (c)(2)...they didn't exercise due care right there....

(Tr. 7/49-50) Although CACO Dowd did not mention the penalty waiver question in his 26 May 2011 final decision, and the evidence concerning waiver is not strong, we find that CACO Dowd testified credibly that he considered contemporaneous costs and penalty waiver before he issued his final decision (supp. R4, tab 306; tr. 6/251, 7/58).

Expert Evidence

93. Darrell J. Oyer was admitted without objection as an expert in:

> [G]overnment contract accounting including, specifically, contractors' policies, procedures, personnel training, and internal control and review systems for providing assurance that unallowable costs are excluded from final indirect cost rate proposals, or more generally, internal controls for segregating unallowable costs.

(Tr. 10/17) The government did not proffer any expert evidence. Mr. Oyer's 25 January 2013 expert report summarizes his opinion:

> Raytheon had an exceptional internal control system in place during the preparation of the 2004 and 2005 indirect cost proposals, as evidenced by (1) extensive and well

---

[6] A third issue, pertaining to an individual's consultant costs (tr. 7/49), was settled.

41

prepared policies, procedures, practices and internal controls required by the DCAA..., (2) highly qualified and trained staff that exceeded DCAA requirements..., (3) an Industry best practice and DCAA-compliant process involving above average staffing for the identification and elimination of unallowable costs from indirect cost submissions..., (4) DCAA conclusions that the systems directly involved in the elimination of unallowable costs from indirect cost submissions were adequate throughout 2004 and 2005 and these conclusions are inconsistent with the decision not to waive penalties..., (5) conclusive factual data that establish that (a) Raytheon improved its process for removing potentially unallowable costs from its submissions from 2001 to 2004/2005 and (b) Raytheon successfully removed a much greater percentage of potentially unallowable costs than most contractors...and (6) the aggressive self-governance steps taken to assure compliance with government accounting rules and advancement of Industry best practices....

(App. supp. R4, tab 700 at 4203-04)

94. Mr. Oyer opined that Raytheon had multiple-tiered policies and procedures for finding unallowable costs, which was unusual in the industry; it had an exceptional internal controls system to segregate and exclude unallowable costs; the qualifications, experience and training of Raytheon's personnel were unusually high; and Raytheon's practices were among the best in the industry (tr. 10/22-23, 25-30, 43, 52, 105, 167). In Mr. Oyer's view an established practice is an acceptable control as well as written policy. Raytheon had both. He saw no evidence that any lack of written guidance caused a problem. (Tr. 10/88, 96-98)

95. Mr. Oyer acknowledged that "subsequently reported" expressly unallowable costs in Raytheon's 2004 Corporate Proposal could affect his opinion as to whether it had effective internal controls, depending upon whether the inclusion was inadvertent or due to a disagreement as to whether a cost was expressly unallowable, or due to an internal control deficiency or some other cause (tr. 10/65). Mr. Oyer did not examine whether an alleged CAS 405 noncompliance cited in the 2 June 2011 COFD related to Raytheon's internal controls. He had no knowledge of the underlying facts or what Raytheon's position was with respect to those costs. (Tr. 10/70-72) Mr. Oyer did not focus upon the question raised in FAR 42.709-5(c)(1) of whether government audits disclosed recurring instances of expressly unallowable costs (except to state that Raytheon had improved its process for cost removal) or upon the question raised in

FAR 42.709-5(c)(2) of whether Raytheon had exercised due care regarding its inclusion of the costs at issue in its 2004 Corporate Proposal.

## DISCUSSION

### Preliminary Matter – Jurisdiction Over All Appeals

Although Raytheon does not oppose designation of the captioned contract as the representative contract in these appeals, the government's proposed switch to this contract from one originally named by Raytheon in its notices of appeal prompted Raytheon to suggest for the first time that the Board's jurisdiction to consider the government's claims is in question. We treat this as a motion to dismiss for lack of jurisdiction. Raytheon contends that, for jurisdictional purposes, the government's claims had to identify the contracts or test contract under which the disputes arose and that they failed to do so. (Bd. corr. file, app. 5 July 2016 ltr.) The cases Raytheon cites for this proposition are inapposite. Moreover, while the CDA requires that a claim relate to a contract, it does not require specific identification of a contract by number. *The Boeing Company*, ASBCA No. 58587, 14-1 BCA ¶ 35,470; *accord Leidos, Inc.*, ASBCA No. 59076, 14-1 BCA ¶ 35,621 (in each case Board granted government's request to substitute representative contract when its claim named contract to which appellant was not a party); *see* 41 U.S.C. § 7105(e)(1)(A) (ASBCA has jurisdiction to decide appeals from various department and agency COFDs "relative to a contract" made by department or agency); *see also* 41 U.S.C. § 7103 (covering claims and COFDs "relating to a contract").

Here, the COFD in ASBCA No. 57743 mentions "applying the appropriate contract percentage" in penalty assessment and the Interest clause in the "applicable contracts," although it does not specify contract numbers (supp. R4, tab 306 at 3442). The audit report upon which the COFD is based notes that "affected contracts" are identified in Raytheon's indirect cost rate proposals (supp. R4, tab 271 at 2905). The Board has not been directed to any evidence that Raytheon has ever claimed ignorance about the contracts involved. The COFDs in ASBCA Nos. 57798 and 58280 each enclose a list of the "Covered Contracts" (supp. R4, tab 315 at 3521-28, tab 323 at 3689-95).

It is apparent from the COFDs and associated audit reports that the government's claims relate to contracts with Raytheon and that the Board has jurisdiction to entertain these appeals. We deny Raytheon's motion to dismiss.

## Burdens of Proof

### Burden to Prove Costs Expressly Unallowable and Subject to Penalty

The government acknowledges that the CO's decision that a cost is expressly unallowable and subject to penalty is subject to the Board's *de novo* review under the CDA (gov't br. at 5). *See* 41 U.S.C. § 7103(e); *Wilner v. United States,* 24 F.3d 1397, 1401-02 (Fed. Cir. 1994) (en banc); that it bears the burden to prove that costs are expressly unallowable; and that "the bar is high" (gov't br. at 2). The government also bears the burden of proof that a penalty assessment was warranted.

In *General Dynamics Corp.,* ASBCA No. 49372, 02-2 BCA ¶ 31,888 at 157,570, *rev'd in part on other grounds, Rumsfeld v. General Dynamics Corp.,* 365 F.3d 1380 (Fed. Cir. 2004), the Board described the government's burden to show that costs are expressly unallowable and subject to penalty:

> The FAR and CAS definitions of "expressly unallowable" point to the need to examine the particular principle involved in light of the surrounding circumstances. Moreover, since Congress adopted the "expressly unallowable" standard to make it clear that a penalty should not be assessed where there were reasonable differences of opinion about the allowability of costs, we think *the Government must show that it was unreasonable under all the circumstances for a person in the contractor's position to conclude that the costs were allowable.* The scope of the inquiry will vary with the clarity and complexity of the particular cost principle and the circumstances involved. [Emphasis added]

### Burden to Prove Abuse of Discretion Concerning Non-Waiver of Penalties

The potential waiver of a penalty, and the burden of proof to be applied regarding the legitimacy of a non-waiver by a CO, were not at issue in *General Dynamics.* The government urges that a CO is afforded "unencumbered discretion" under 10 U.S.C. § 2324(c)(3) and FAR 42.709-5(c) whether to waive a penalty because the statute and regulation provide that a contractor must demonstrate to the "[CO's] satisfaction" that it meets the criteria for waiver (*see* gov't reply br. at 103). The government contends that it is Raytheon's burden to prove that the CACO abused his discretion and acted arbitrarily or capriciously when he did not grant penalty waivers and that, even if Raytheon were to establish that the CACO did not apply the waiver criteria correctly, Raytheon is required to show that it was prejudiced by the regulatory violation.

44

Raytheon disputes that a CO has unfettered discretion regarding waiver. It asserts that the term "shall" used in 10 U.S.C. § 2324(c) concerning the grant of a penalty waiver and at the outset of the FAR 42.709-5 waiver provision denotes the imperative that the CO must grant a penalty waiver under certain conditions, citing FAR 2.101 ("[s]*hall* means the imperative") and *Fiber Materials, Inc.*, ASBCA No. 53616, 07-1 BCA ¶ 33,563 at 166,259 (although Penalties for Unallowable Costs clause states that the CO "may" waive penalties pursuant to criteria in FAR 42.709-5, that regulation provides that CO "shall" waive penalties under certain conditions[7]). Thus, the CO's discretion is limited. Moreover, while the CO's satisfaction is an element of his analysis, it is subject to an abuse of discretion or arbitrary or capricious standard.

Raytheon contends that the CACO's alleged determination that Raytheon did not meet the penalty waiver criteria to his satisfaction is a mixed question of law and fact; his interpretation of the regulatory requirements necessary to meet the criteria is reviewed *de novo*; his factual determination as to whether Raytheon met the criteria is subject to the arbitrary and capricious standard; and the government bears the burden to prove that the CACO "appropriately decided not to waive the penalties" (app. br. at 2). Raytheon alleges that the waiver determination is intertwined with the government's penalty claims and the government thus bears the burden of proof on both. While Raytheon agrees with the government that the CO's violation of the waiver regulation must be prejudicial to Raytheon in order for it to prevail (app. reply br. at 15), it asserts that such a violation is obviously prejudicial in the current circumstances.

In fact, the proper balance is that, once the government meets its burden to show that costs were expressly unallowable, Raytheon bears the burden to prove that the CO's determination not to waive the penalty was an arbitrary and capricious abuse of discretion. *See United States Fidelity & Guaranty Co. v. United States*, 676 F.2d 622, 628 (Ct. Cl. 1982) (surety bore high burden of proof to show CO arbitrarily and capriciously abused discretion in failing to withhold progress payment). This is akin to the shifting burdens of proof in a government claim for a default termination. The government bears the burden to prove the termination justified; if it does, the burden shifts to contractor to show, among other potential mitigating factors, that the CO's default decision was an arbitrary or capricious abuse of the CO's discretion. *Lisbon Contractors, Inc. v. United States*, 828 F.2d 759, 765 (Fed. Cir. 1987); *Shubhada Industries, Inc.*, ASBCA No. 54016, 08-1 BCA ¶ 33,733 at 167,017. The degree of proof required to show that the CO abused his discretion is related to the amount of discretion afforded to the CO by statute and regulation. *Keco Industries, Inc. v. United States*, 492 F.2d 1200, 1204 (Ct. Cl. 1974) (the greater the discretion, the greater the contractor's burden); *see, e.g., U.S Fidelity & Guaranty*, 676 F.2d at 630-31.

---

[7] The Board in *Fiber Materials* was addressing the regulation's $10,000 penalty threshold, which the Board clarified in *Thomas Associates, Inc.*, ASBCA No. 57126, 11-2 BCA ¶ 34,858 at 171,477.

In determining whether a CO's decision is arbitrary or capricious or an abuse of discretion we consider (1) whether there is evidence of subjective bad faith on the part of the CO; (2) whether the CO had a reasonable, contract-related basis for the decision; (3) the amount of discretion given to the CO; and (4) whether there was a proven violation of a statute or regulation. *U.S. Fidelity & Guaranty*, 676 F.2d at 630; *Raytheon Company, Space & Airborne Systems*, ASBCA No. 58068, 16-1 BCA ¶ 36,484 at 177,773; *see also Campbell Plastics Engineering & Mfg., Inc. v. Brownlee*, 389 F.3d 1243, 1250 (Fed. Cir. 2004); *McDonnell Douglas Corp. v. United States*, 182 F.3d 1319, 1326 (Fed. Cir. 1999); *Keco Industries*, 492 F.2d at 1204. There is no need for each of the four factors to be present in order to establish arbitrary and capricious action by the CO. *Prineville Sawmill Co. v. United States*, 859 F.2d 905, 911 (Fed. Cir. 1988). For example, proof of the fourth factor might be enough to show that the CO's conduct was arbitrary and capricious. *U.S. Fidelity & Guaranty*, 676 F.2d at 630. However, the regulatory violation must have been prejudicial. *Todd Construction, L.P. v. United States*, 656 F.3d 1306, 1316 (Fed. Cir. 2011); *Raytheon Company, Space & Airborne Systems*, ASBCA No. 57801 *et al.*, 15-1 BCA ¶ 36,024 at 175,957.

The Board's scope of review of alleged arbitrary and capricious action is narrow and we are not to substitute our judgment for that of the agency. However, the agency must have examined the relevant data and be able to articulate a satisfactory explanation for its action, including a rational connection between the facts and the action. *Motor Vehicle Manufacturers Ass'n of the United States, Inc. v. State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29, 43 (1983).

## ASBCA No. 57743 Discussion

## Aircraft Fractional Lease Costs

### The Parties' Contentions

The government alleges that, contrary to FAR 31.205-46, Travel costs, and to Raytheon's February 2005 Advance Agreement with the government (finding 28), Raytheon's 2004 Corporate Proposal included $350,567 in management and lease fees and $45,360 in usage fees under a fractional lease agreement involving its shared lease of a private aircraft. There is no dispute that Raytheon's use of its fractional lease aircraft was not required by contract. Further, under the Advance Agreement, Raytheon had agreed to "disallow" 66% of its management fees but it did not exclude any of them, and it had agreed to "disallow" 66% of its usage fees but it excluded only 60% of them (gov't br. at 73-74). The government concludes that the fractional lease fees were "specifically named and stated" to be unallowable under FAR 31.205-46 and the Advance Agreement, and therefore are "expressly unallowable" and subject to penalty. (Gov't br. at 73-74)

46

Raytheon counters that the fractional lease aircraft costs are not expressly unallowable and subject to penalty. The government misinterpreted FAR 31.205-46, which does not identify specific corporate aircraft costs as unallowable and contains certain allowances for travel at rates above standard coach airfare. In any event, under Board precedent, the costs are not expressly unallowable (app. br. at 123 (citing *Fiber Materials*, 07-1 BCA ¶ 33,563 at 166,256)). Also, the COFD covering corporate costs for 2004 asserted a claim for penalties under FAR 42.709-(a)(1), which prescribes penalties for indirect costs that are "expressly unallowable under a cost principle in the FAR, or an executive agency supplement to the FAR." FAR 42.709-(a)(1) plainly does not cover costs alleged to be expressly unallowable under the December 2003 Advance Agreement (finding 23) or the February 2005 Advance Agreement. In any case, the aircraft fractional lease costs are not "specifically named and stated to be unallowable" under either agreement.

Lastly concerning aircraft fractional lease costs, Raytheon contends that the government attempted to raise two new claims that the Board does not have jurisdiction to consider because CACO Dowd did not include them in his COFD regarding 2004 corporate costs. The first putative new claim was the government's statement that DCAA found that fractional lease costs were subject to a "double penalty" (gov't br. at 77), which suggested to Raytheon that the government now seeks level 2 penalties regarding the fractional lease costs in question. Raytheon states that DCAA's penalty conclusion is irrelevant because the COFD stated a claim for single penalties under FAR 42.709-1(a)(1) and not a claim for double penalties under FAR 42.709-1(a)(2). The government did not respond to Raytheon's contentions in this regard, which Raytheon considers to be an abandonment of "any hint that it is seeking 'double penalties'" (app. reply br. at 5 n.1). The Board concurs and will not address this matter further.

The second alleged new claim is that Raytheon failed to apply the 66% disallowance factor specified in the February 2005 Advance Agreement, resulting in the government's current stated claim for $350,567 in management and lease fees and $45,360 in usage fees. However, the COFD disallowed and asserted penalties on fractional lease aircraft costs of $336,892 based upon Raytheon's failure to apply the 60% disallowance factor contained in the December 2003 Advance Agreement. We treat this as a motion to dismiss the government's fractional aircraft lease claims to the extent they are based upon the 2005 Advance Agreement and have increased the government's claims.

The government disputes that its current reliance upon the February 2005 Advance Agreement is a new claim and contends that its adjusted claim is based upon the same operative facts upon which the COFD was based. Other than their disallowance factors, the December 2003 and February 2005 Advance Agreements are virtually identical. The government asserts that the only thing that has changed from its original claim is that it

discovered during litigation that it had used the 60% disallowance factor from the December 2003 Advance Agreement when it should have used the February 2005 Advance Agreement's increased 66% factor. While this resulted in a minor monetary increase, it did not alter the nature of the original claim and the Board has jurisdiction over the increased claim.

## Rulings

## Jurisdiction

We address the jurisdictional issue first. Claims are deemed to be separate for CDA purposes "if they *either* request different remedies (whether monetary or non-monetary) or assert grounds that are materially different from each other either factually or legally." *K-Con Building Systems, Inc. v. United States*, 778 F.3d 1000, 1005 (Fed. Cir. 2015). The "different remedies component" is not so rigid a standard as to preclude all adjustments in amounts based upon matters developed in litigation. *Id.* at 1006. An increase (or reduction) on appeal in the amount claimed does not constitute a new claim under the CDA as long as the nature of the claim and basic operative facts are essentially the same. *Todd Pacific Shipyards Corp.*, ASBCA No. 55126, 06-2 BCA ¶ 33,421 at 165,687; *see also Tecom, Inc. v. United States*, 732 F.2d 935, 937-38 (Fed. Cir. 1984); *Exelis, Inc.*, ASBCA No. 60131, 16-1 BCA ¶ 36,485 at 177,779-80; *Trepte Construction Co.*, ASBCA No. 38555, 90-1 BCA ¶ 22,595 at 113,385.

In this case the government has not requested a different remedy or asserted grounds for recovery in its adjusted claim that are materially different from its original claim. The essential nature and operative facts of the government's claim are that, in its 2004 Corporate Proposal, Raytheon neglected to use the disallowance factor regarding aircraft fractional lease costs that was established in its February 2005 Advance Agreement with the government, which was effective from 1 January 2004 through 31 December 2005. The COFD erroneously cited the December 2003 Advance Agreement. The 2005 agreement was substantially the same as the 2003 agreement, except for a 6 percentage point increase in the disallowance factor. The government corrected its error at the hearing. (*See* finding 36) Under the circumstances, the nature of the government's claim was the same and the operative facts were essentially the same. The claim was not tantamount to a new CDA claim and we have jurisdiction to consider it. We deny Raytheon's motion to dismiss.

## Aircraft Fractional Lease Costs Are Not Expressly Unallowable

In his 26 May 2011 COFD, CACO Dowd assessed level 1 penalties against Raytheon under FAR 42.709-1(a)(1) for including allegedly expressly unallowable fractional aircraft lease costs in its 2004 Corporate proposal (finding 16). That FAR provision applies to indirect costs that are "expressly unallowable under a cost principle

48

in the FAR, or an executive agency supplement to the FAR, that defines the allowability of specific selected costs" (finding 2).

FAR 31.001 defines an "expressly unallowable" cost as "a particular item or type of cost which, under the express provisions of an applicable law, regulation, or contract, is specifically named and stated to be unallowable" (finding 2). The CAS definition is the same, and the CAS Board noted that "expressly" unallowable meant unallowable in direct or unmistakable terms (*id.*). No law or regulation specifically names aircraft fractional lease costs and states that they are unallowable. FAR 31.205-46 (2003) covers, *inter alia*, the costs of travel by contractor-leased aircraft. FAR 31.205-46(d) (2003) contemplates circumstances when airfare costs in excess of the lowest customary standard, coach, or equivalent airfare could be allowable, and FAR 31.205-46(e)(2) (2003) gives the CO discretion to approve higher costs, including via an advance agreement or otherwise. (Finding 20) Thus, aircraft fractional lease costs are not expressly unallowable under FAR 31.205-46. *See Fiber Materials*, 07-1 BCA ¶ 33,563 at 166,256.

Moreover, the lease costs were not specifically named and stated to be unallowable under the parties' February 2005 Advance Agreement at issue. Raytheon was first to reduce total aircraft fractional lease costs by "all unallowable" and unallocable trips, which it would voluntarily withdraw. The balance of the lease costs were to be classified as "allowable," subject to the application of a 66% disallowance factor. (Finding 29) This is a negotiated percentage of potentially otherwise allowable costs that Raytheon agreed not to include in its proposal.

Even if 66% of the balance of the aircraft fractional lease costs were deemed to be specifically stated to be unallowable, and therefore expressly unallowable under the Advance Agreement contract and the definition of "expressly unallowable" in FAR 31.001 and the CAS, they were not subject to a penalty assessment. The statutory and regulatory structures do not impose penalties upon all expressly unallowable costs. Title 10 U.S.C. § 2324(b) provides for penalties when a contractor includes in its proposal a cost that is "expressly unallowable under a cost principle referred to in subsection (a) that defines the allowability of specific selected costs" (finding 2). Subsection (a) of the statute refers to the FAR or an applicable agency supplement to the FAR, not to a contract (*id.*). Consistently, as noted above, FAR 42.709-1(a)(1) describes the penalties if an indirect cost is expressly unallowable under a FAR cost principle or executive agency FAR supplement. Similarly, FAR 42.709-3(a) requires a level one penalty assessment under FAR 42.709-1(a)(1), absent a waiver, "when the submitted cost is expressly unallowable under a cost principle in the FAR or an executive agency supplement that defines the allowability of specific selected costs" (*id.*). Thus, the pertinent statute and penalty regulations are unambiguous. We construe them in accordance with their plain language and do not insert additional words or phrases to alter an otherwise plain and clear meaning. *Tesoro Hawaii Corporation v. United States*, 405

49

F.3d 1339, 1346-47 (Fed. Cir. 2005); *Raytheon Company*, ASBCA No. 57576 *et al.*, 15-1 BCA ¶ 36,043 at 176,050 (referred to by Raytheon and herein as "the *CAS 405 Decision*"). The statute and penalty regulations do not include within their scope costs that are expressly unallowable under a contract.

Because Raytheon's aircraft fractional lease costs were not subject to the penalty improperly assessed by the CACO under FAR 42.709-1(a)(1), Raytheon's appeal is sustained in this regard.

### Challenger 604 Aircraft Costs

### The Parties' Contentions

The government alleges that, during 2004, Raytheon's second leased aircraft, the Challenger 604, was used only by its CEO and that Raytheon included $62,940, or 38% of its costs for this aircraft in its 2004 Corporate Proposal that were expressly unallowable under FAR 31.205-46. It notes that use of the Challenger 604 was not required by contract; Raytheon did not have the CO's approval to charge more than standard airfare but did so nonetheless; it included more than it had contemporaneously proposed as a recoverable factor; and it included more than the 34% to which the parties had eventually agreed under their October 2005 Advance Agreement (finding 44).

While Raytheon has agreed to withdraw the Challenger 604 costs at issue, and would not dispute a determination that they are unallowable (app. pre-hearing br. at 63), it disputes that they are expressly unallowable, for the same reasons it advanced regarding the aircraft fractional lease costs. It also asserts that the October 2005 Advance Agreement was signed several months after Raytheon submitted its 2004 Corporate Proposal on about 2 June 2005 (finding 13) and costs cannot become expressly unallowable and subject to penalties retroactively. Raytheon states that it reasonably used the recoverability factor negotiated for its Hawker aircraft as a placeholder for its Challenger 604 costs with the understanding that it would agree to withdraw any difference ultimately negotiated for the Challenger 604, consistent with its past practice of post-submittal negotiations.

### Ruling

In his 26 May 2011 COFD, CACO Dowd assessed level 1 penalties against Raytheon under FAR 42.709-1(a)(1) for including allegedly expressly unallowable Challenger 604 lease costs in its 2004 Corporate Proposal (finding 16). Those lease costs are covered by FAR 31.205-46 (finding 20). They are not expressly unallowable under a FAR cost principle or executive agency FAR supplement. For the reasons given above regarding Raytheon's aircraft fractional lease costs, regardless of whether

the Challenger 604 costs were expressly unallowable under the October 2005 Advance Agreement, which we need not decide, they were not subject to penalty.

Because Raytheon's Challenger 604 lease costs were not subject to the penalty improperly assessed by the CACO under FAR 42.709-1(a)(1), Raytheon's appeal is sustained in this regard.

## Lobbying Costs

### The Parties' Contentions

In his 26 May 2011 COFD, CACO Dowd assessed level 1 penalties against Raytheon under FAR 42.709-1(a)(1) for including allegedly expressly unallowable lobbying costs in its 2004 Corporate Proposal (finding 16). The government asserts that costs associated with lobbying activities, such as the labor costs of employees performing those activities, are clearly expressly unallowable under FAR 31.205-22 and under Raytheon's own corporate policies (*see* finding 47).

Raytheon agrees that it included unallowable lobbying expenses in its proposal, albeit inadvertently, but it disagrees that the costs were expressly unallowable. It contends that FAR 31.205-22 does not make all costs associated with lobbying activities unallowable but rather only those associated with specifically enumerated lobbying costs, subject to exceptions. Although Raytheon states that there is no evidence that any of the costs at issue were for any of the enumerated activities, it acknowledges that it intended to withdraw them but inadvertently failed to do so. Raytheon's Washington Office engaged in both allowable and unallowable activities and Raytheon was using a ratio to withdraw a portion of the office's total compensation costs in accordance with FAR 31.201-6(e)(2) (*see* finding 49).

Raytheon alleges that "the compensation costs of employees who sometimes engage in unallowable lobbying activities are directly associated costs, not expressly unallowable costs" (app. br. at 130). It notes that some cost principles, such as FAR 31.205-6, Compensation for personal services, specifically name certain compensation as unallowable, but FAR 31.205-22 does not mention compensation or salary. Raytheon alleges that only expressly unallowable costs, not directly associated costs, are subject to penalties under FAR 42.709-1(a)(1) (app. br. at 131). It further contends that the math errors that contributed to its failure to withdraw all of the costs it intended to withdraw are the type of inadvertent errors contemplated by FAR 42.709-5(c)(2). Additionally, Raytheon asserts that the government's monetary claim is significantly overstated due to errors by DCAA. Finally, Raytheon asserts that the CACO abused his discretion in failing to waive the level one penalties assessed, particularly because Raytheon's lobbying withdrawal errors resulted from simple human error, not from a failure in Raytheon's internal controls.

51

In support of their positions, both parties rely upon the *CAS 405 Decision*, which decided appellant's appeals from the CACO's 10 January 2011 and 2 June 2011 decisions (finding 88), and another appeal. In the *CAS 405 Decision* the government contended, *inter alia*, that Raytheon had not excluded from its cost submissions bonus and incentive compensation (BAIC) costs for individuals who engaged in activities that generated unallowable costs under various FAR cost principles, including lobbying covered by FAR 31.205-22, which rendered the BAIC costs expressly unallowable. It also contended that Raytheon had failed to exclude the costs of stock awards to employees under its long term performance plan (LTPP) that were expressly unallowable under FAR 31.205-(6)(i). In the instant appeals, the BAIC and LTPP costs have been referred to respectively as "dividend equivalents" and "incentive compensation" (app. sur-sur reply at 2).

In relevant part, the Board granted summary judgment to appellant that BAIC costs were not expressly unallowable under FAR 31.205-22 and other cost principles; the government had not established a violation of CAS 405; and it was not entitled to impose penalties. The Board distinguished BAIC from salary and fringe benefits— different types of compensation. The Board noted that, while portions of salary and fringe benefits were specifically stated to be unallowable under FAR 31.205-1, Public relations and advertising costs, and those forms of compensation were defined and addressed separately in other cost principles, neither BAIC nor compensation cost was specifically named and stated to be unallowable under FAR 31.205-22 and the other cost principles at issue, nor identified as unallowable in any direct or unmistakable terms. In response to the government's allegation that Raytheon apparently had treated its BAIC costs from its lobbying cost center as mutually agreed unallowable directly associated costs, the Board stated:

> Raytheon's treatment of these costs, for whatever reason, cannot negate the clear language of CAS 405 and the implementing regulations that guide us in determining whether costs are expressly unallowable under a cost principle.

*CAS 405 Decision*, 15-1 BCA ¶ 36,043 at 176,050.

Regarding costs that are unallowable public relations and advertising costs under FAR 31.205-1(f)(1), as further defined in FAR 31.205-1(c), the Board stated in part:

> We must presume that the FAR framers' choice of language when addressing unallowable labor cost under this cost principle was knowing and deliberate. With respect to the terms they did use – "salaries" and "fringe benefits" – the government has not shown that BAIC cost is equivalent to, or subsumed under either.

> However, these BAIC costs may be unallowable on
> another basis, that is, as a "directly associated cost" (DAC)
> to unallowable salary cost. See FAR 31.201-6(a) (when
> unallowable cost incurred, its DAC also
> unallowable)...Under this provision, a DAC is a cost
> "generated solely as a result" of another cost and "would not
> have been incurred had the other cost not been incurred."

*CAS 405 Decision*, 15-1 BCA ¶ 36,043 at 176,051-52. The Board concluded that a material factual dispute as to whether BAIC met the directly associated cost requirements precluded summary judgment for either party.

However, the Board granted summary judgment to the government that the BAIC costs of those engaged in lobbying activities, while not expressly unallowable, were unallowable under FAR 31.205-22(a). The Board stated that it was "self-evident that a basic element of a contractor's lobbying costs is the compensation paid to those who perform lobbying activities." *CAS 405 Decision*, 15-1 BCA ¶ 36,043 at 176,052.

The Board also determined, in relevant part, that appellant's Total Shareholder Return "share award costs" under its LTPP program constituted compensation costs that were expressly unallowable under FAR 31.205-6(i) and it granted summary judgment to the government on entitlement on those claims as expressed in the 2 June 2011 COFD and in a 12 May 2012 COFD. *CAS 405 Decision*, 15-1 BCA ¶ 36,043 at 176,055.

In the current appeal, the government does not address the fact that the Board found that appellant's BAIC costs were not expressly unallowable and it alleges that the *CAS 405 Decision* supports CACO Dowd's non-waiver of the penalties he assessed against Raytheon:

> The Board's Opinion upholds significant portions of
> CACO Dowd's January 10, 2011 and June 2, 2011 Final
> Decisions. In fact, the Board's Opinion confirms the
> "correctness" of CACO Dowd's determinations that
> Raytheon violated CAS 405 for its repeated inclusion of
> certain "expressly unallowable" costs in its incurred cost
> proposals since FY 2002 and FY 2004, respectively. As a
> result, the Board's Opinion affords another **independent,
> reasonable basis for Mr. Dowd to conclude that
> Raytheon failed to meet the criteria of FAR 42.709-5(c)**,
> and is, therefore, dispositive over the fact that CACO Dowd
> did not abuse his discretion by refusing to waive penalties.

(Gov't sur-reply at 2-3)

53

Raytheon describes the *CAS 405 Decision* as holding that the compensation costs of Raytheon's Washington Office employees are not expressly unallowable and it posits that "[t]his conclusively precludes the Government from seeking penalties for Washington Office compensation costs in these appeals" (app. sur-sur reply at 1). Raytheon contends that the Board's holding "clearly applies to the 'salary' costs at issue in this case" (*id.* at 3). Raytheon also notes that, contrary to the government's contention here, the Board in its *CAS 405 Decision* refuted the significance of Raytheon's internal policies in interpreting CAS 405 and its implementing regulations.

Raytheon also alleges that, differing from its prior position, the government does not argue in its sur-reply that CACO Dowd considered the facts at issue in the *CAS 405 Decision* when he assessed, and did not waive, penalties in the instant appeals, but rather now argues only that the decision corroborates his determinations. Raytheon states that any evidence to the contrary must be struck from the record. In effect it renews its prior motion to strike, which the Board denied in *Raytheon I.*[8]

Ruling

Salary Costs Associated with Raytheon's
Unallowable Lobbying Activities are Expressly Unallowable

As noted, FAR 31.001 provides in relevant part that an expressly unallowable cost is a particular item or type of cost which, under the express provisions of an applicable regulation, is specifically named and stated to be unallowable (finding 2). Costs associated with certain named lobbying activities are stated to be unallowable under FAR 31.205-22 (finding 45). Therefore, they are expressly unallowable.

Each party overstates the Board's holdings in its *CAS 405 Decision*, which is not dispositive of either party's positions. There, the Board stated that neither BAIC nor compensation cost was specifically named and stated to be unallowable under FAR 31.205-22, and thus those costs were not expressly unallowable. The Board distinguished BAIC costs from salary costs, covered in other regulations, although both are types of compensation. The Board stated that it was obvious that compensation costs of those engaged in the listed lobbying activities were unallowable under FAR 31.205-22(a). *CAS 405 Decision*, 15-1 BCA ¶ 36,043 at 176,052.

Indeed, it would be unreasonable under all the circumstances for Raytheon to conclude that the salary costs of its employees engaging in the listed lobbying activities were allowable. *See General Dynamics Corp.*, 02-2 BCA ¶ 31,888 at 157,570. The lobbying cost principle would carry little weight if salaries were not covered. Although

---

[8] We deny this renewed motion in view of our disposition of this appeal.

not dispositive, as noted in the *CAS 405 Decision*, Raytheon's own internal policy and regulatory interpretation conclude that the lobbying salary costs are not allowable. (Finding 47) Raytheon alleges, without persuasive citation on point, that directly associated costs differ from expressly unallowable costs and cannot be subject to penalties (app. br. at 131). However, the FAR specifically names salary expenses, which it treats as directly associated costs, as unallowable under certain circumstances. We construe FAR 31.201-6 as a whole. *See General Dynamics Corp.*, ASBCA No. 31359, 92-1 BCA ¶ 24,698 at 123,255, *recon. granted in part on other grounds*, 92-2 BCA ¶ 24,922. FAR 31.201-6(e)(2) states that *"salary expenses of employees who participate in activities that generate unallowable costs shall be treated as directly associated costs* to the extent of the time spent on the proscribed activity, provided the costs are material" (emphasis added) (finding 46). Under FAR 31.201-6(a), "[w]hen an unallowable cost is incurred, *its directly associated costs are also unallowable"* (emphasis added) (finding 2). Thus, material salary expenses of employees who engage in activities that generate unallowable lobbying costs are named and stated to be unallowable under the combination of FAR 31.201-6(a) and FAR 31.201-6(e)(2). Therefore, those salary costs are expressly unallowable as defined in FAR 31.001 and subject to penalty under FAR 42.709-1(a)(1) (finding 2). We address below whether the assessed penalty concerning lobbying costs should have been waived.

## Icent Database Costs

### The Parties' Contentions

The government alleges that Raytheon's 2004 Corporate Proposal included $200,000 paid to Icent to design a database concerning M&A and divestitures, as established by Icent's agreement with Raytheon and Icent's specifications. The government asserts that those costs are expressly unallowable under FAR 31.205-27(a)(1) (finding 64) and that Raytheon's corporate policies and the balance of hearing testimony by Raytheon personnel, including its former Director of Corporate Government Accounting, recognize that M&A and divestiture costs are expressly unallowable.

Raytheon counters that the Icent database was intended for multiple purposes, some of which would generate unallowable costs and some of which would not, such as economic planning and market planning, the costs of which are allowable under FAR 31.205-12 and 31.205-38(b)(4) (findings 63, 65), respectively. Raytheon also notes that the database was never used because the project was never completed. Therefore, the database was never used for a transaction covered by FAR 31.205-27(a). Lastly, Raytheon alleges that the line between allowable planning costs and unallowable organization costs is widely recognized to be unclear and that the overlapping regulations create a continuum such that it is reasonable to treat costs as allowable until the CO has determined that they are not allowable or an actual M&A target has been identified. Thus, such costs could not be "expressly unallowable" or subject to penalties.

## Ruling

Under FAR 31.205-12 costs of "generalized long-range management planning that is concerned with the future overall development of the contractor's business" are allowable but the regulation excludes organization and reorganization costs covered by FAR 31.205-27 (finding 63). FAR 31.205-38 states that market planning involves market research and analysis and generalized management planning concerned with the contractor's business development; the allowability of long-range market planning costs is controlled by FAR 31.205-12; and other market planning costs are allowable to the extent that they are reasonable and not in excess of certain limitations (finding 65). FAR 31.205-27 provides in relevant part that "expenditures in connection with" planning "the organization or reorganization" of a business' corporate structure, "including mergers and acquisitions," are unallowable (finding 64). The regulation does not clearly limit its coverage to costs of targeting a specific merger or acquisition. Although it mentions "the" organization or reorganization of a business, in the singular, it also refers to costs in connection with mergers and acquisitions broadly, in the plural, not to "a" merger and acquisition.

Thus, the distinction between allowable economic planning costs under FAR 31.205-12 and unallowable organization costs under FAR 31.205-27 is unclear. The regulations themselves do not draw a defined line between the two. However, reading the regulations together, including with FAR 31.205-38, the intent appears to be that costs in connection with actually planning the organization or reorganization of a business, such as by a specific merger or acquisition, are unallowable whereas generalized long-range management planning costs are allowable. A learned treatise, in discussing the interplay between organization costs under FAR 31.205-27 and economic planning costs under FAR 31.205-12, supports this analysis:

> [C]are should be taken to distinguish between the costs of planning an organizational change, the costs of which are unallowable, and the costs of generalized long range planning. Under FAR 31.205-12, Economic Planning Costs, the costs of surveying various business opportunities, making demographic and economic studies, and evaluating potential markets or firms for mergers or acquisitions would be allowable. Conversely, once a target has been identified, the costs of planning or executing organizational changes would be unallowable.

(Ex. A-21 (JOHN CIBINIC, JR. & RALPH C. NASH JR., COST-REIMBURSEMENT CONTRACTING at 943 (3d ed. 2004))

56

Icent's proposed database was intended to be used both for general planning and specific M&A purposes when ultimately configured (*see* findings 67, 70-75). However, Raytheon terminated Icent's design and build of its M&A application. It was never completed or used in connection with any M&A target. (Findings 76, 78) Therefore, the costs at issue are properly categorized as allowable economic and market planning costs. They were not expressly unallowable and subject to penalty, which the CACO assessed improperly. Raytheon's appeal is sustained in this regard.

## Waiver of Penalties Pursuant to FAR 42.709-5(c)

### The Parties' Contentions

The government alleges that CACO Dowd was afforded considerable discretion in deciding not to waive penalties, subject to review only as to whether his determination was arbitrary and capricious or an abuse of discretion. It asserts that he properly considered the following: the nature and amount of the expressly unallowable costs in Raytheon's proposal, including alleged recurring instances of expressly unallowable costs, such as aircraft fractional lease costs and the consulting costs of a Mr. Mofford (not at issue in these appeals); the two recurring CAS 405 noncompliances involving Raytheon Corporate's compensation costs addressed in the *CAS 405 Decision* that occurred "at least since" 2004 (gov't br. at 120) and several years thereafter; and numerous internal control deficiencies identified by DCAA after 2004 in Raytheon Corporate's business systems, including its Indirect/ODC system. The government contends that CACO Dowd considered that two DCAA audits in the CYs 2004 and 2005 timeframe of Raytheon's Indirect/ODC system found it to be adequate with no significant deficiencies. However, he did not deem those findings to be dispositive because, by the time of his June 2011 COFD (finding 88), he had more information available to him.

The government also contends that, while he was not aware of it at the time, CACO Dowd's determination not to waive penalties is supported by the fact that Raytheon did not follow its own internal government contract compliance policy, which called for written procedures concerning indirect cost proposals that were not in place, regardless of Raytheon's claim that the policy did not apply to the Budgets Group that prepared the 2004 Corporate Proposal. The government further contends that CACO Dowd's determination not to waive penalties is validated by Raytheon's failure to exercise due care when it included corporate aircraft and lobbying costs in the 2004 Corporate Proposal. The government also urges the Board to disregard Mr. Oyer's expert opinion, which it contends is unreliable and of no value to the Board.

Raytheon responds that it met both of the criteria for waiver of penalties under FAR 42.709-5(c) (addressed below) and that CACO Dowd was thus required under the regulation to waive them. His determination that Raytheon did not meet these criteria to his satisfaction is a mixed question of law and fact; the Board reviews his regulatory

57

interpretation of the waiver requirements *de novo*; and his factual determination as to whether Raytheon met the criteria is subject to an arbitrary and capricious standard. Raytheon contends, *inter alia*, that CACO Dowd's alleged determination that it did not meet FAR 42.709-5(c)(1)'s waiver criteria was arbitrary and capricious. In the context of the overall amount of costs contained in the 2004 Corporate Proposal, the fact that the $1.4 million in alleged expressly unallowable cost items exceeded FAR 42.709-5(b)'s $10,000 penalty threshold had no rational bearing upon waiver considerations. Additionally, alleged deficiencies that occurred after Raytheon certified its proposal were not a rational basis for declining waiver. The evidence adduced at the hearing, and expert Oyer's opinion. established that Raytheon satisfied the waiver criteria.

Raytheon further alleges that CACO Dowd's determination that it did not meet FAR 42.709-5(c)(2)'s waiver criteria was also arbitrary and capricious. The record demonstrates that Raytheon's inclusion of aircraft fractional lease costs and lobbying costs in its 2004 Corporate Proposal resulted from unintentional error, notwithstanding the exercise of due care.

### Ruling

Preliminarily, we have not relied upon Mr. Oyer's opinions. While he bolstered Raytheon's contention that it has unusually good internal controls, he did not focus upon the question raised in FAR 42.709-5(c)(1) of whether government audits disclosed recurring instances of expressly unallowable costs or upon the question raised in FAR 42.709-5(c)(2) of whether Raytheon had exercised due care regarding its inclusion of the costs at issue in its 2004 Corporate Proposal (finding 95). In any event, the Board does not require expert guidance concerning those questions, which are the Board's province to decide.

We have held that Raytheon's aircraft fractional lease, Challenger aircraft, and Icent database costs were not expressly unallowable and were not subject to the penalties assessed by the CACO. Thus, the only costs at issue with regard to the waiver of penalties are the expressly unallowable salary costs, to the extent they are material, of employees who engaged in activities that generated unallowable lobbying costs.

There are several lobbying cost errors or omissions at issue. Raytheon did not provide written instructions to Ms. Ferrero, the budget analyst responsible for calculating a lobbying cost disallowance factor used to withdraw lobbying costs from the 2004 Corporate Proposal. She relied upon her prior year's spreadsheet and conversations with Mr. Reynolds, a supervisor in her office who assembled lobbying disclosure reports to Congress, and with Raytheon's Washington Office personnel. That office provided information and timesheets to Mr. Reynolds; Ms. Ferrero did not receive them. She reviewed Mr. Reynolds' report of lobbying activities for 2004, but it did not include timesheets or notifications from the Washington Office to him about missing time sheets

58

and certain employee terminations and hiring, resulting in shortened employment periods for various employees that affected her labor base allocations. A spreadsheet in Mr. Reynolds' report showed a zero balance of hours for certain employees. The Washington Office advised Ms. Ferrero that they had left the company. She intended to adjust her lobbying withdrawal ratio but did not do so. Further, she did not notice that Mr. Reynolds' spreadsheet showed zero hours for the first half of 2004 for two employees, one of whom had lobbying hours. She did not know why they were not reported. In addition to her proration errors, Ms. Ferrero's disallowance factor calculations erroneously included hours for work by Raytheon's CEO Swanson, which had been withdrawn elsewhere. The effect was to understate the percentage of time the Washington Office was working on unallowable cost matters. (Findings 50-54)

DCAA found that Raytheon did not have time logs for 3 lobbyists, amounting to 518 disallowed lobbying hours that had not been withdrawn plus time logs for 6 other lobbyists had not been accounted for correctly due to misinterpretations, omissions and math errors, resulting in 501 disallowed lobbying hours. Lastly, Raytheon had understated its cost withdrawal by including a year of hours in its calculation base for 3 lobbyists who were employed for only a part of a year. Although the amount is now in dispute, Raytheon initially agreed with DCAA that its CY 2004 lobbying cost withdrawal was understated by $242,655, which was adjusted during negotiations to $224,925. (Findings 56, 57, 59, *see* finding 92)

In relevant part, FAR 42.709-5(c), which implements 10 U.S.C. § 2324(c), provides that the CO shall waive penalties when the contractor demonstrates "*to the cognizant [CO's] satisfaction*" that:

> (1) It has established policies and personnel training and an internal control and review system that provide assurance that unallowable costs subject to penalties are precluded from being included in the contractor's final indirect cost rate proposals (*e.g.*, the types of controls required for satisfactory participation in the Department of Defense sponsored self-governance programs, specific accounting controls over indirect costs, compliance tests which demonstrate that the controls are effective, *and Government audits which have not disclosed recurring instances of expressly unallowable costs); and*

> (2) The unallowable costs subject to the penalty were inadvertently incorporated into the proposal; *i.e.*, their inclusion resulted from an unintentional error, *notwithstanding the exercise of due care*. [Emphasis added]

We do not need to address whether the "Government audits which have not disclosed recurring instances of expressly unallowable costs" provision of FAR 42.709-5(c)(1) refers only to audits covering periods that are contemporaneous with that covered by a contractor's indirect cost proposal and/or only to the same type of costs.[9] In this case, although CACO Dowd described various matters, including audits, that he relied upon in not issuing any penalty waivers (findings 87-91), he also named lobbying cost errors in the 2004 Corporate Proposal that he considered to be significant and specifically concerned him. He determined that the errors evidenced that Raytheon had not exercised proper oversight, amounting to a lack of due care. Thus, Raytheon had not demonstrated to his satisfaction that a penalty waiver was warranted under FAR 42.709-5(c)(2). (Finding 92)

As stated, Raytheon's burden to prove that CACO Dowd abused his discretion or acted arbitrarily or capriciously in deciding not to waive the lobbying cost penalty he assessed is heavy. The Board's scope of review of the CACO's discretionary determination is narrow and we are not to substitute our judgment for his. Raytheon did not establish any of the four factors that can show arbitrary and capricious action by a CO: subjective bad faith; lack of a reasonable, contract-related basis for the CO's decision; overreaching the discretion accorded the CO; and the CO's violation of a statute or regulation. To the contrary, the record reflects that CACO Dowd examined relevant data concerning the lobbying costs and that he articulated a satisfactory explanation for his decision not to waive the penalty.

Raytheon's appeal is denied in this regard. Quantum issues (*see, e.g.,* findings 61, 62) are remanded to the parties for resolution.

Raytheon's appeal in ASBCA No. 57743 is sustained in part and denied in part as set forth above.

ASBCA Nos. 57798, 58280

FINDINGS OF FACT

96. On 31 August 2005, IDS submitted its 2004 proposal (IDS Proposal), which contained $1.06 billion in indirect IDS office costs. On 11 August 2006 it submitted its 2005 IDS Proposal, which included $1.1 billion in indirect IDS office costs. (App. supp. R4, tabs 645-56) ASBCA Nos. 57798 and 58280 pertain to the government's contention that Raytheon included consultant costs in its 2004 and 2005 IDS Proposals

---

[9] For example, finding 10 addresses a different 2003 lobbying cost dispute cited in a 2005 audit report. Other audits address other cost issues.

that were expressly unallowable under FAR 31.205-33, Professional and consultant service costs, which provides in part:

> (a) *Definition.* "Professional and consultant services"...means those services rendered by persons who are members of a particular profession or possess a special skill and who are not officers or employees of the contractor. Examples include those services acquired by contractors or subcontractors in order to enhance their legal, economic, financial, or technical positions. Professional and consultant services are generally acquired to obtain information, advice, opinions, alternatives, conclusions, recommendations, training or direct assistance, such as studies, analyses, evaluations, liaison with Government officials, or other forms of representation.

> (b) Costs of professional and consultant services *are allowable subject to this paragraph and paragraphs (c) through (f) of this subsection when reasonable in relation to the services rendered* and when not contingent upon recovery of the costs from the Government (but see 31.205-30 and 31.205-47). [Emphasis added]

> ....

> (d) In determining the allowability of costs (including retainer fees) in a particular case, no single factor or any special combination of factors is necessarily determinative. However, the [CO] shall consider the following factors, among others:

> (1) The nature and scope of the service rendered in relation to the service required.

> (2) The necessity of contracting for the service, considering the contractor's capabilities in the particular area.

> ....

61

(6) Whether the service can be performed more economically by employment rather than by contracting.

(7) The qualifications of the individual or concern rendering the service and the customary fee charged....

(8) Adequacy of the contractual agreement for the service (e.g., description of the service, estimate of time required, rate of compensation, termination provisions).

(e) Retainer fees, to be allowable, must be supported by evidence that—

(1) The services covered by the retainer agreement are necessary and customary;

(2) The level of past services justifies the amount of the retainer fees (if no services were rendered, fees are not automatically unallowable);

(3) The retainer fee is reasonable in comparison with maintaining an in-house capability to perform the covered services, when factors such as cost and level of expertise are considered; and

(4) The actual services performed are documented in accordance with paragraph (f) of this subsection.

(f) *Fees for services rendered are allowable only when supported by evidence of the nature and scope of the service furnished (See also 31.205-38(c)). However, retainer agreements generally are not based on specific statements of work.* Evidence necessary to determine that work performed is proper and does not violate law or regulation shall include—

(1) Details of all agreements (e.g., work requirements, rate of compensation, and nature and amount of other expenses, if any) with the individuals or organizations providing the services and details of actual services performed;

(2) Invoices or billings submitted by consultants, including sufficient detail as to the time expended and nature of the actual services provided; and

(3) Consultants' work products and related documents, such as trip reports indicating persons visited and subjects discussed, minutes of meetings, and collateral memoranda and reports. [Emphasis added]

97. At all relevant times, Raytheon's Corporate Policy No. 71-0009-110, "CONSULTANTS; RETENTION OF," effective 13 January 1995, governed its retention of U.S. consultants (supp. R4, tab 101 at 1004; 2nd amended compl. ¶ 81; GPFF ¶ 206). According to David Powers, a Manager of Government Accounting at Raytheon IDS since 2004 (tr. 1/167-68), the policy was "woefully outdated" (tr. 1/207). Much of it had been updated in practice and it was not necessarily how Raytheon did things in 2004, although no superseding policy has been issued (tr. 1/207-08).

98. The consultant policy states: "Where a physical work product...is produced due to the consultant's services, the person supervising the consultant's activity [the consultant's sponsor] is to retain copies of the work product as support for the services provided" (supp. R4, tab 101 at 1006, ¶ 2.6; GPFF ¶ 208). To engage a consultant, a Purchase Order [PO] Requisition, Consultant Request, Summary of Qualifications for Prospective Consultant, and a Consulting Agreement were to be prepared. The Procurement Manager was to retain the PO requisition until the agreement was approved. (Supp. R4, tab 101 at 1008, ¶ 6.1.1) The policy appended a sample consultant's agreement and provided that: "Consulting Agreements are to utilize the terminology indicated in Form 10-3332. Some sections of Form 10-3332 may be modified or omitted in appropriate circumstances." (*Id.*, ¶ 6.1.1 b, *see* tab 101 at 1014)

99. A 9 May 2002 Memorandum for Regional Directors (MRD), DCAA, on the subject of "Audit Guidance on Documentation Requirements Under FAR 31.205-33(f)" addressed a 31 March 1989 report by the Defense Acquisition Regulations Council Cost Committee, the drafters of the regulation (supp. R4, tab 109; *see* APFF ¶ 80). The MRD noted that the Committee had commented in connection with the proposed rule, said to be substantially the same as the final FAR language, that all three categories of evidence cited in the provision were required to support consultant costs. The Committee stated:

> In order to effectively evaluate the propriety or legality of consultant activities, one has to check the agreement, the billings and the output and compare them against each other to ensure that, for instance, the billings make sense in light of the output received. *If substantial funds have been paid*

*to a consultant and yet there is little or no evidence of work having been performed by him, then that may be an indication that the funds are being provided and employed for suspect purposes (e.g., bribes). It is necessary for Government personnel to look at each of these areas in order to determine that funds are not being spent on questionable activities; the extent is to be determined on a case-by-case basis.*

(Supp. R4, tab 109 at 1199-1200) (Other italics & bold omitted)

100. The MRD reported that the Committee further commented:

The Government is merely asking to review the data that any reasonable business already has. The oral nature of some work in this area apparently causes concern among the contracting fraternity. Aside from the fact that most people who are billing for, in effect their time, are scrupulous about documenting their time for billing purposes, it apparently needs to be reiterated that *the Government is looking for evidence of the reasonableness and legitimacy of the costs involved, not documentation of every word uttered. For example, if a person was hired to provide a training session, then the contract, the bill and some evidence – which it should be noted could be oral testimony of one of the students – that the class was in fact given could be sufficient to meet the Government's needs.* Allowability of costs has always depended on the contractor being able to demonstrate reasonableness and legitimacy of the costs being submitted; this draft revision merely provides some guidance and clarification in this apparently troublesome area.

(Supp. R4, tab 109 at 1201) (Other italics omitted)

101. The MRD concluded:

The contractor must support all consultant costs with evidence from each of the three categories listed in FAR 31.205-33(f). *Although auditors may not substitute their auditor judgment for the explicit requirements of the cost principle, auditor judgment remains important for determining if the evidence provided in each category is adequate.* In order to make a well-reasoned audit opinion

64

on consultant costs, auditors must have sufficient and relevant evidence to determine the nature and scope of the consultant work actually performed. By specific requirement of the cost principle, auditors should not make a determination on the allowability of consultant costs without evidence from all three categories, i.e., (1) evidence of what work is to be performed, (2) evidence supporting the invoice, and (3) evidence of what work was actually performed. For example, the auditor may not use evidence from category 1 to allow the consultant cost in the absence of evidence from the other categories.

Regarding the issue of whether the consultant's work product is always an absolute requirement for cost allowability, we believe that the third category of evidence is intended to require evidential matter in support of what work the consultant actually performed (in contrast to what work is planned to be performed in category one). *Although a work product usually satisfies this requirement, other evidence may also suffice.* Therefore, if the auditor has sufficient evidence demonstrating the nature and scope of the consultant work actually performed, the FAR 31.205-33(f)(3) requirements are met even if the actual work product (e.g. an attorney's advice to the contractor) is not provided. If the nature and scope of the actual work performed cannot be determined and the contractor refuses to provide the work product, the auditor should question the costs as unallowable under FAR 31.205-33(f). *However, the auditor should not insist on a work product if other evidence provided is sufficient to determine the nature and scope of the actual work performed by the consultant.*

(Supp. R4, tab 109 at 1201-02) (Emphasis added) The MRD stated that, if a contractor failed to provide supporting evidence required by FAR 31.205-33(f), the auditor should recommend a penalty under FAR 42.709 (*id.*).

102. A 19 December 2013 MRD, on the subject of "Audit Alert on Professional and Consultant Service Costs (FAR 31.205-33) and Purchased Labor," issued after the IDS audits and COFDs in question here, states in part:

FAR 31.205-33(f) contains three documentation requirements to ensure that professional and consultant service costs can be determined allowable: (1) details of

65

all agreements; (2) invoices or billings; and (3) consultant work product and related documents. *Auditor judgment is critically important in determining whether the totality of the evidence demonstrates the nature and scope of the services provided.... The type of evidence satisfying the documentation requirements will vary significantly based on the type of consulting effort* and from contractor to contractor.

(App. supp. R4, tab 703 at 4318) (Emphasis added) Regarding the third requirement, the MRD states that "[e]xplanation of what the consultant accomplished for the fees paid – this could be *information on the invoice*, a drawing, a power point presentation, or *some other evidence of the service provided*" (*id.* at 4319) (emphasis added). The MRD continues:

> The claimed costs are unallowable without evidence of an agreement, an invoice, and what work the consultant actually performed. It is important to clarify that the audit team is looking for evidence to satisfy these three areas and not a specific set of documents. Therefore, auditor judgment will be the determining factor on the type and sufficiency of evidence required to satisfy these requirements.
>
>   ....
>
> The contractor may provide evidence created when the contractor incurred the cost as well as evidence from a later period.... As an example of evidence from a later period, the contractor may facilitate a meeting between the consultant and the audit team to obtain documentation (*oral/written*) from the consultant regarding what effort they [sic] performed.

(*Id.*) (Emphasis added) Responses to "FREQUENTLY ASKED QUESTIONS" included with the MRD indicate that "contemporaneous" evidence and evidence "from a later period" (app. supp. R4, tab 703 at 4323 (answer 5)), including meetings and oral interviews, can potentially yield sufficient evidence of work product (*id.* at 4323-24, answers 5-7).

103. Anthony D'Adamo, a former DCAA auditor who joined DCMA, preceded Matthew Grzyb, who issued the COFDs at issue, as the DACO at IDS (tr. 1/41-43). In Mr. D'Adamo's experience, at DCAA and DCMA:

[C]onsulting costs had always been an issue at Raytheon Company. Always been a finding within the DCAA reports. And then subsequent when I came to DCMA, the issues of consulting costs and documentation requirements was still there.

(Tr. 1/51; GPFF ¶ 210)

104. On 10 April 1997 Herbert Homer, the DCMA Raytheon CACO at the time, sent a "Determination of Noncompliance/Notice of Cost Unallowability" regarding "Consultant Service Costs" to Raytheon's Executive Vice-President/CFO (supp. R4, tab 103; GPFF ¶ 211) The letter was critical of Raytheon's failure to maintain current consultant agreements. Mr. Homer concluded:

> I have concluded that Raytheon is in noncompliance with the provisions of [FAR 31.205-33 and Raytheon's General Policy and Procedure 71-0009-110]. Therefore, beginning with the submission of the Company's CY 1996 final overhead rate/ incurred cost claim, any consultant service costs that are not supported by a fully executed consultant service agreement will be disallowed for cost recovery purposes. Furthermore, any such disallowed costs will be considered "expressly unallowable" under the applicable cost principle and, therefore, will be subject to a penalty assessment in accordance with requirements of DFARS 231.7002 (Penalties for Unallowable Costs).

(Supp. R4, tab 103 at 1026) Raytheon contends that this letter and others cited immediately below are irrelevant to these appeals.

105. On 4 December 1998, DCAA's resident auditor at Raytheon Corporate's Resident Office wrote to CACO Homer concerning DCAA's audit of Raytheon's CY 1996 consultants. She stated that DCAA had found Raytheon to be in "non-compliance" with FAR 31.205-33 and Raytheon's own policies and procedures related to obtaining consulting agreements and providing work product and that, in DCAA's opinion, Raytheon did not have the proper internal controls in place to assure that the objectives stated in its Policy and Procedure 71-0009-110 were met. She concluded:

> We consider Raytheon's inability to follow their own procedures relative to consultant costs to be significant in view of the materiality of the types of charges incurred by the company from 1994 through 1997. Accordingly, based on

67

> the foregoing information, we believe that Raytheon's classification. approval process and not maintaining meaningful consultant agreements and work products to be a severe internal control weakness that requires immediate attention and corrective action by the company's top management.

(Supp. R4, tab 105 at 1044) CACO Homer provided a copy of this letter to Raytheon on or before 31 December 1998 (supp. R4, tab 106 at 1045, ref. c; GPFF ¶ 214).

106. During negotiations relating to Raytheon's CY 1996 incurred cost proposal, on 31 December 1998, CACO Homer sent a second "Determination of Noncompliance/Notice of Cost Unallowability" letter to Raytheon's executive vice president/CFO (supp. R4, tab 106; GPFF ¶ 215). CACO Homer asserted that Raytheon had not yet fully complied with his 10 April 1997 letter. including the specified FAR requirements and Raytheon's own consultant policy, and there were numerous instances in Raytheon's CY 1996 final overhead rate/incurred cost claim when it had not supported its claimed consultant services costs with "either a current consultant agreement and/or adequate work product" (supp. R4, tab 106 at 1046). CACO Homer stated that his letter was to reiterate the FAR requirements for consultant services costs and to "reaffirm the Government's rights relative to the assessment of penalties for unallowable costs" (id.). CACO Homer warned, similarly to his 10 April 1997 letter:

> [B]eginning with the submission of Raytheon's CY 1997 final overhead rate/incurred cost claim, any consultant services costs that are not supported by a current (fully executed) consultant services agreement and adequate work product will be disallowed for Government recovery purposes. Additionally, any such disallowed costs will be considered to be "expressly unallowable" under the applicable cost principle and, therefore. will be subject to a penalty assessment in accordance with the requirements of the Defense FAR Supplement 231.7002 (Penalties for Unallowable Costs).

(Id.) The 31 December 1998 letter stated that it appeared that Raytheon had initiated proper control procedures to ensure its future compliance with the FAR and Raytheon's policy (id.). CACO Homer concluded that Raytheon should "scrub its CY 1997 consultant services costs very carefully to be absolutely sure that each and every proposed/claimed consultant is supported by a current (fully executed) consultant agreement and adequate work product" (id. at 1047).

68

107. Raytheon's FAR Part 31 Guidelines are used throughout the company, including by IDS. Mr. Pflaumer had a substantial role in drafting them. Version 2 of the Guidelines, promulgated on 31 August 2004, was in force during the preparation of the 2004 Corporate proposal. (Supp. R4, tab 158; 2nd amended compl. ¶ 37; tr. 1/204, 2/122, 5/18, 207) The Guidelines provide that "[c]onsultant costs need to be supported by an executed Consultant Agreement and be evidenced by work product, as applicable, in order to 'Claim'" (supp. R4, tab 158 at 2131). The Guidelines' references to "claim" and "don't claim" mean that Raytheon considers the given cost to be allowable or unallowable (or, e.g., unallocable or not advisable to claim for some "sensitive" reason) (tr. 1/204-05, 2/122-23, 7/161).

108. As part of a CY 2005 course on "Understanding Unallowable and Allowable Costs; Financial Planning and Analysis Curriculum," Raytheon personnel were given oral and written guidance regarding unallowable costs, including how to identify unallowable costs under FAR Part 31 (supp. R4, tab 351; tr. 2/159-60; GPFF ¶ 222). In connection with consultant costs, during this course Raytheon employees were presented with an example when a DCAA audit "reveals that while copies of the [consultant's] invoices were retained by the area receiving the services, there was no written or tangible work product, and the only version of the consultant agreement available was an unsigned draft copy" (supp. R4, tab 351 at 5030; see GPFF ¶ 223). The "Facilitator Notes" stated:

> In this example, the costs are unallowable since the consultant's services related to [M&A] activity, which is made unallowable by FAR 31.205-27, Organization Costs. However, even if the consultant's services were for an allowable activity, the government would most likely consider these costs unallowable.
>
> This is another area where there have been audit issues in the past. Specifically, DCAA has questioned costs where consulting agreements were not signed and where there was no evidence of work product. The FAR requires, among other things, that details of all agreements (including scope of work and rate of compensation), invoices with sufficient detail, and consultants' work products be available as evidence to determine whether the costs are allowable.
>
> The retention of consultants is covered by Raytheon policy 000000025-RP and generally, adherence to Company policy will result in maximum cost recoverability. This case is another example of where audit issues arise as a result of inadequate compliance with Company policy. **Failure to**

**adequately comply with Company policies will needlessly result in allowable costs being considered unallowable by the government.**

(Supp. R4, tab 351 at 5029; *see* GPFF ¶ 224)

109. Raytheon Air Defense and Naval Systems (ADNS) was the predecessor business segment to IDS. Raytheon ADNS became Raytheon IDS in or around CY 2003. (Tr. 1/84-85, 104; GPFF ¶ 226) In 2002 and 2003 DCAA issued audit reports on ADNS' incurred cost proposals for CY 2000 and 2001, which determined that the proposals contained expressly unallowable consulting costs, including for Stephen Stanvick, one of the consultants whose costs are at issue in these appeals, that were subject to a level 1 penalty. The first audit concluded that ADNS had not provided any support for Mr. Stanvick's costs. The second audit concluded that it had not provided a consultant agreement for him, as required by FAR 31.202-33(f). (Supp. R4 tab 114 at 1366, tab 119 at 1542-43; tr. 1/85-88)

110. Thereafter IDS and DACO D'Adamo negotiated lump sum compromise settlements that reduced the amount of questioned costs and penalties recommended by DCAA as reflected in DACO D'Adamo's two COFDs, dated 1 July 2005. IDS did not agree that inadequately supported consultant costs were expressly unallowable. The decisions did not specify the costs at issue. (*See* supp. R4, tabs 253, 254, 279 at 3068, 3077-78, 3083; app. supp. R4 tab 666 at 3517; tr. 1/88, 94-95, 140-41, 143-44)

111. In 2004 IDS hired David Powers as a manager of government accounting. He had worked for two decades in government accounting roles at three other government contractors. Mr. Powers' major responsibilities included "scrubbing" unallowable costs from IDS' annual incurred cost proposals and supporting DCAA's audits. His scrubbing process typically started at the end of the calendar year, such that, in January 2005, he began to look at IDS' 2004 costs and in January 2006, he began to review the 2005 costs. (Tr. 1/167-68, 171, 173, 2/87-89, 5/9; GPFF ¶ 239 with app. add., GPFF ¶ 240)

112. Mr. Powers independently sampled certain cost elements, coded as allowable in IDS' booking system, that he considered to be "high-risk" (tr. 1/177), including lobbying and consulting costs, and attempted to remove any unallowable costs. His supervisor, Randall Kerr, performed a "cursory review at the end of the process" (tr. 1/175), examining key findings, in preparation for their meeting with the IDS CFO to give him a basic summary of the cost determinations. Mr. Powers consulted with Mr. Kerr on any issues that required discussion. Mr. Kerr had never disagreed with Mr. Powers' conclusions. (Tr. 1/172-79, 184, 191, 2/19, 89-90, 96; GPFF ¶ 241 with app. add., GPFF ¶ 242)

113. When Mr. Powers first joined IDS in 2004, there was an issue of insufficient documentation regarding engineering consultants. also referred to as technical consultants, and some of the business development consultants. One of his responsibilities was to correct this. To do so, and to correct an issue of consultants not receiving timely payment. Mr. Powers was tasked with performing the original coding of the allowability of the costs of IDS' technical consultants, including Mr. Stanvick, for CYs 2004 and 2005. (Tr. 1/180, 182, 189. 217-18; GPFF ¶¶ 244-46)

114. In analyzing whether consultant costs were unallowable for CYs 2004 and 2005, Mr. Powers was unaware that Raytheon did not appeal. and had paid, at least a portion of the consultant penalties assessed in DACO D'Adamo's 1 July 2005 COFDs (finding 110) and he was unaware of CACO Homer's 1997 and 1998 "Determination[s] of Noncompliance/Notice of Cost Unallowability" regarding "Consultant Service Costs" (findings 104. 106). (Tr. 2/6-7; GPFF ¶¶ 248. ¶ 249, with app. add.)

115. As part of his scrub of the 2004 IDS Proposal. Mr. Powers removed $90,000 of consulting costs as unallowable under FAR 31.205-33 because he could not locate a consulting agreement and/or invoices (tr. 1/180, 198; GPFF ¶¶ 250-51). After Mr. Powers' scrub was complete, the final IDS proposal was brought to IDS' CFO. After a summary presentation by the Manager of Business Governance. the CFO certified that IDS was not submitting unallowable costs to the government for reimbursement. For CYs 2004 and 2005, the process took about 45 minutes to an hour. (App. supp. R4. tabs 644, 655; tr. 2/92-94, 155-58; GPFF ¶ 252)

### DCAA's 2002-2005 Audits of IDS

116. For CYs 2002-2005 DCAA audited ADNS' and IDS' incurred cost proposals and opined that unallowable costs had been included in each one, including consultant costs said to be unsupported and expressly unallowable under FAR 31.205-33. Raytheon does not agree that the consultant costs at issue in these appeals were expressly unallowable. (Supp. R4. tab 146 at 1929-31, tab 256 at 2707-09, tab 277 at 3006-09, tab 278 at 3059, tab 284 at 3126-28; tr. 1/101-03; GPFF ¶ 253, with app. add.)

117. On 30 June 2004 DCAA issued an audit report on ADNS' CY 2002 incurred cost proposal. which determined that ADNS had included unallowable and expressly unallowable cost items in its CY 2002 incurred cost proposal, including expressly unallowable consulting costs for Mr. Stanvick and others. DCAA stated that the contractor had failed to provide consulting agreements and work product details as required by FAR 31.205-33(f) and opined that the expressly unallowable costs were subject to a level one penalty. (Supp. R4, tab 146 at 1929-30; tr. 1/102-03)

71

118. As part of its audit evaluation of IDS' CYs 2003 and 2004 consulting costs, DCAA wrote to Mr. Powers on 15 November 2004 and 19 January 2006 respectively, asking for copies of or access to the following types of supporting documentation:

1. Consultant agreements[.]
2. Consultant's work products (reports, briefings, etc.) and billings.
3. Correspondence between consultants and the contractor.
4. Travel vouchers and trip reports.
5. Internal audit reports providing coverage in this area.
6. Any other documents, which provide evidence of the nature and scope of the services furnished and the reasonableness of the amounts. charged.
7. Any data. reports, or listings supplied to CPAs, the SEC, or others of sensitive consultant costs.

(Supp. R4, tab 214 at 2320-21, tab 265 at 2878-79; tr. 1/266-69)

119. On 3 August 2005 DCAA issued an audit report on IDS' CY 2003 proposal which reached the same conclusions as the 30 June 2004 audit report concerning consulting costs for Mr. Stanvick and others (supp. R4, tab 256 at 2707-08; tr. 1/104-05; finding 117).

120. On 25 August 2006 DCAA issued an audit report on IDS' CY 2004 proposal. DCAA questioned $52,979 of the consultant costs for the late Vice Admiral J. Guy Reynolds (Ret.) under FAR 31.205-33(f) due to failure to provide a defined work product. It also questioned $62,142 of his costs as unreasonable under FAR 31.201-3 on the ground that he had made extravagant trips to Hawaii, Spain and Australia, including flying first class. Raytheon later withdrew certain first class airfare costs. (Supp. R4, tab 279 at 3081-82) DCAA questioned Mr. Stanvick's consulting costs on the ground that his invoices did not contain enough detail as to time expended and nature of the services rendered. DCAA determined that the costs for each of these consultants were expressly unallowable and subject to a level one penalty. (Supp. R4, tab 277 at 3006-08)

121. On 9 August 2007 DCAA issued an audit report on IDS' CY 2005 proposal which questioned consultant costs for Mr. Stanvick and VADM Reynolds under FAR 31.205-33 and determined that they were expressly unallowable and subject to a level one penalty (supp. R4, tab 284 at 3126-27). DCAA again found that Mr. Stanvick's invoices did not contain enough detail as to time expended and nature of the services rendered. It questioned VADM Reynolds' costs due to lack of work product and reported that all of his invoices contained the same description (below). (*Id.* at 3127)

122. In the years following these audits, IDS and DCMA negotiated regarding IDS' CYs 2002-2005 incurred costs (tr. 1/101, 105-21, 2/99-101; GPFF ¶ 264). During

72

the negotiations for CY 2005, IDS responded to DCMA's allegations that there was no work product for Mr. Stanvick by noting that he was on a retainer, which would be paid even if he performed no effort. Mr. Pflaumer cited Mr. Stanvick's Patriot Missile expertise as a reason for keeping him on retainer. After CY 2005 Raytheon decided to eliminate retainers and Mr. Stanvick was no longer a consultant. (Supp. R4, tab 279 at 3082; ex. G-1 at 9682) During the negotiations with DCMA, IDS agreed to remove as unallowable certain costs, including all of the consultant costs currently at issue in these appeals (supp. R4, tab 279 at 3068; tr. 1/108-09, 2/105; GPFF ¶ 266). However, the parties were unable to reach agreement as to whether any of the costs were expressly unallowable and subject to penalties (supp. R4, tab 279 at 3068, tab 299 at 3342, tab 300 at 3352; tr. 1/111, 2/106-08, 185; ex. G-1 at 9682; GPFF ¶ 267).

123. Shared notes dated 1 October 2006 of the parties' negotiations stated:

> Randy Kerr [IDS' Manager of Business Governance] asked if the questioned costs would be subject to penalty. He stated that the consultant costs are not expressly unallowable. Tony D'Adamo stated that the prior incurred costs negotiations had resulted in his decision that consultant costs not having an agreement or work product should be removed from the incurred cost submissions. Raytheon had agreed to the questioned costs at prior negotiations.

(Supp. R4, tab 279 at 3068; tr. 1/109-11; GPFF ¶ 268)

124. By letter to DACO D'Adamo dated 16 December 2009 regarding the CYs 2002-2005 negotiations and DCAA's penalty recommendations, Mr. Kerr contended, *inter alia*, that consultant costs were not *per se* expressly unallowable but could be unallowable under certain circumstances. He requested that DACO D'Adamo refrain from assessing penalties on costs that were not expressly unallowable and that he waive certain penalties. (Supp. R4, tab 300)

125. In September 2010, more than six years after Mr. Stanvick's 2004 consulting agreement (below) was signed, Mr. Grzyb took over for Mr. D'Adamo as DACO for IDS. The parties' negotiations regarding IDS' 2004 and 2005 incurred cost submissions were already complete when Mr. Grzyb joined DCMA. Mr. D'Adamo assisted in his transition and served as his direct supervisor. (Tr. 1/124-27, 165-66, 2/179-84; GPFF ¶ 272) DACO Grzyb determined that IDS did not meet the criteria for waiver under FAR 42.709-5 and, in a memorandum for the file dated 29 August 2011 concerning CY 2004 costs, he stated that the consultant costs at issue were expressly unallowable because IDS was unable to provide substantiating documentation (supp.

73

R4, tab 313 at 3485. 3489; tr. 2/225. 227). He issued a similar memorandum, dated 17 July 2012. concerning IDS' CY 2005 costs (supp. R4, tab 322).

126. No COFDs were issued for CYs 2002 and 2003 that asserted government claims for the types of costs at issue in these appeals (*see* tr. 2/195).

127. DACO Grzyb issued a COFD dated 30 August 2011 asserting penalties and interest totaling $778,368 against IDS for including allegedly expressly unallowable costs in its CY 2004 incurred cost proposal. Of that amount. $588,094 was principal and $190,274 was interest. The decision stated that the $588,094 represented "the portion of the disallowed costs allocable to covered contracts" and that the DACO had "determined that Raytheon IDS has been paid for these expressly unallowable costs through interim billings." (Supp. R4, tab 315 at 3518-19) Regarding consulting costs, he determined that VADM Reynolds' 2004 costs, in the amount of $52,979, and Mr. Stanvick's 2004 costs, in the amount of $54,046, were "expressly unallowable" as no work product was submitted. He cited FAR 31.205-33(f) as the basis for his decision. (Supp. R4, tab 315 at 3517; tr. 2/231)

128. DACO Grzyb issued another COFD, also dated 30 August 2011, which determined that the same CY 2004 costs were "unallowable" and had to be removed from all provisional and final billings. This decision included an additional $10,000 of VADM Reynolds' costs on the ground that his consultant travel costs for trips to Hawaii. Spain and Australia were unreasonable as they exceeded what a prudent business would pay. (Supp. R4, tab 316 at 3531)

129. With respect to his COFD assessing penalties regarding CY 2004 costs, DACO Grzyb testified:

> Q So, when you were formulating your decision for CY 2004, did you consider 2002 and 2003?
>
> A Absolutely. Yes, I considered them. Again. like I said, I considered the whole picture of everything I had in front of me from 2000 through 2005, the audit reports. previous decisions that penalized similar costs, and where Raytheon had paid similar costs. You know, Stanvick, for instance, was penalized in, I think, 2000. 2001, and...in every year after that as having costs, including in the incurred cost proposal. They were questioned and sustained. So, again, I used everything in order to try to make a full, overarching view of the position.

74

Q So, you mentioned Mr. Stanvick had costs in 2002 and 2003. How specifically did [this] influence your decision in 2004?

A Well, again, he had – again, in 2002, 2003, we really had, from what I remember,...a significant lack of documentation. I don't think he had anything. I don't think we had agreements or invoices or work product. I think in 2004...he didn't have work products, you know, inadequate invoices, and, you know, an agreement which was only issued halfway through the year.

So, you know, again, it just ends up being a history of the same type of cost that we see over and over as being subject to penalty.

(Tr. 2/196-97)

130. By letter of 27 September 2011 to DACO Grzyb, referring to his decision regarding CY 2004 costs said to be expressly unallowable, Anthony F. O'Brien, IDS' Vice President of Finance and CFO, noted that IDS did not agree with the findings and application of penalties and interest. Nonetheless Raytheon paid $480,159 of the $778,368 the DACO had demanded, covering penalties on various cost items. It did not pay penalties on consultant costs, disputed that it owed interest on penalties, and stated its intention to appeal. IDS disagreed that the government had paid the costs at issue:

> Relative to the application of interest, as provided in FAR 42.709-1, interest is only applicable on the paid portion of the disallowance subject to penalty. To date, IDS has billed the US Government using only the approved billing rates established by the DCMA which included a decrement to reflect historically disallowed amounts as provided in FAR 42.704. The costs identified as expressly unallowable have not been billed to the US Government, therefore no interest would be applicable.

(Supp. R4, tab 318 at 3570)[10]

---

[10] IDS also contended that penalties on certain items must be waived because they were under $10,000 each. IDS has since abandoned this contention. (Supp. R4, tab 318 at 3570; tr. 2/119-20; GPFF ¶ 282)

131. On 30 September 2011 Raytheon appealed to the Board from DACO Grzyb's 30 August 2011 COFD asserting penalties and interest against IDS for including allegedly expressly unallowable costs in its CY 2004 incurred cost proposal. The Board docketed the appeal as ASBCA No. 57798. Raytheon did not appeal from DACO Grzyb's separate COFD of the same date, which determined that the same CY 2004 costs were unallowable (tr. 2/121, 231-32). The notice of appeal mentioned the total $778,368 amount assessed in the COFD and did not exclude any of the cost elements cited by the DACO. However, by the time of the hearing, it was apparent that only the matters addressed below are in dispute in ASBCA No. 57798.

132. By COFD dated 19 July 2012, DACO Grzyb assessed penalties and interest against IDS totaling $633,702, of which $486,657 was penalty and $147,045 was interest, for the inclusion of various cost items in its CY 2005 incurred cost proposal said to be "expressly unallowable" (supp. R4, tab 323 at 3683). This included allegedly unsupported consulting costs for Mr. Stanvick, VADM Reynolds, and Kissinger & McLarty in the amounts of $72,000, $216,540, and $420,000, respectively. DACO Grzyb cited FAR 31.205-33 as the basis for his consulting cost decision. (Id. at 3684) The decision stated that the $486,657 represented "the portion of the disallowed costs allocable to covered contracts" and that the DACO had "determined that Raytheon IDS has been paid for these expressly unallowable costs through interim billings" (id. at 3685-86).

133. DACO Grzyb issued another COFD, also dated 19 July 2012, which determined that the same CY 2005 costs were "unallowable" and had to be removed from all provisional and final billings (supp. R4, tab 324 at 3699, 3701).

134. By letter dated 14 August 2012 to DACO Grzyb, referring to his decision regarding CY 2005 costs said to be expressly unallowable, IDS' CFO O'Brien noted that it did not agree with the findings and application of penalties and interest. Nonetheless, Raytheon paid $242,589 of the $633,702 the DACO had demanded, covering penalties on various cost items. It did not pay penalties on consultant costs, disputed that it owed any interest on penalties, and stated its intention to appeal. For the same reasons quoted above regarding IDS' 2004 costs (finding 130), IDS disagreed that it had billed for, and the government had paid, the costs the government alleged to be expressly unallowable. (ASBCA No. 58280, R4, tab 10)

135. In the meantime, on 13 August 2012 Raytheon appealed to the Board from DACO Grzyb's 19 July 2012 COFD asserting penalties and interest against IDS for including allegedly expressly unallowable costs in its CY 2005 incurred cost proposal. The Board docketed the appeal as ASBCA No. 58280. Raytheon did not appeal from the DACO's separate COFD of the same date, which had claimed that the same costs were unallowable (tr. 2/120-21, 234). The notice of appeal mentioned the total $633,702 amount assessed in the COFD and did not exclude any of the cost elements

cited by the DACO. However, by the time of the hearing, it was apparent that only the matters addressed below are in dispute in ASBCA No. 58280.

136. Raytheon's appeals from CACO Dowd's decisions assessing penalties against it covered the following consultant costs:

> J. Guy Reynolds, 2004 -- $52,979
> Stephen Stanvick, 2004 -- $54,046
> TJK Consultants Ltd., 2004 -- $18,000
> J. Guy Reynolds, 2005 -- $216,540
> Stephen Stanvick, 2005 -- $72,000
> Kissinger McLarty Associates, LLC, 2005 -- $420,000

(Supp. R4, tab 315 at 3517-18, tab 323 at 3684-85; APFF ¶ 90) Raytheon did not contest various other costs identified in the decisions.

137. Prior to the hearing Raytheon agreed to withdraw IDS' 2004 costs for VADM Reynolds and TJK Consultants and its 2005 costs for Kissinger McLarty Associates, without conceding that they were unallowable, and the government withdrew its associated penalty claims (tr. 9/23-24, 72-74; ex. A-28).

### Stephen Stanvick's Consulting Services

138. Mr. Stanvick was for many years an IDS engineer, then program manager, and from 1980-85 served as chief engineer for the Patriot Missile Defense System. During the first Gulf War he gained international recognition for his successful efforts leading the IDS program that fielded the first battery of Patriot missiles to intercept enemy missiles in a combat setting. Mr. Stanvick became a vice president of Raytheon in 1993. (App. supp. R4, tab 506, see tab 522; tr. 8/74-76, 79-81, 83, 87; APFF ¶ 93)

139. Mr. Stanvick retired from Raytheon in 1998 and worked as a consultant from 1998 through 2005. He was given a copy of Raytheon's consulting policy when he first starting working as a consultant. Mr. Stanvick's memory was not strong on whether he signed any consulting agreements prior to 2004. He believed he signed some one-page agreements, beginning when he became a consultant in 1998, but the record does not contain any such agreements. (Tr. 8/81-82, 113, 117-18)

140. At the end of June 2004, Raytheon and Mr. Stanvick entered into a written consulting agreement for the period 1 January 2004 through 31 December 2004. The Statement of Work provided in part:

> During the term of this agreement Consultant will be
> available to consult with Raytheon management in

connection with various IDS Programs and initiatives. His tasks will include but not be limited to: Red Teams, proposal reviews, reviews of briefings and technical analyses, writing and/or reviewing papers for outside publication, strategic planning, evaluation/assessment of win strategies, advice on new areas of technical concentration, or any other matters relating to the full scope of IDS products or services. Additionally, consultant may be requested to represent Raytheon on Association of the United States Army (AUSA) issues.

(Supp. R4, tab 145 at 1911) Mr. Stanvick was to be paid a retainer of $6,000 per month, plus expenses not to exceed $20,000. He was to comply with all Raytheon policies and all Federal regulations. The agreement provided that the "Consultant shall submit invoices on a monthly basis, along with a detailed report describing the services performed" (*id.* at 1912). Mr. Stanvick was not paid, and Raytheon's government contracts were not charged, for his 2004 consulting services until after the 2004 agreement was signed (tr. 2/78-79, 8/101). In December 2004 the consulting agreement was amended to extend through 31 December 2005 (supp. R4 tab 233).

141. As a consultant, Mr. Stanvick never lobbied Congress on behalf of Raytheon. The work described in his consultant's agreement reflected the work he performed as a consultant except that he did not write much. He presented his information orally or in dictation to an assistant. He was getting paid to "stay alert" and to help Raytheon (tr. 8/96). Several missile engineers would call him and ask questions. Some of his non-classified work was by telephone and in-person contact. He provided and was available for technical assistance, guidance and training. He advised on what types of analysis and what types of tests should be performed. He led meetings and participated in "Red Team" (a cast of people with a lot of experience (tr. 8/93)) review of bid and technical proposals and Cost and Operational Effectiveness Analyses, including handwritten mark-ups, which were destroyed because much of the data was classified. He consulted concerning the Strategic Defense Initiative and participated in drafting a white paper concerning Raytheon's missile capability. Mr. Stanvick had a top secret clearance with multiple "black" access programs at a higher classified level. His work on the Patriot Missile System was highly classified. Part of his consultant work was on missile deployment studies. His work on missile systems documents prepared by others was classified. "[I]n Mr. Stanvick's case, again, a lot of what he did was highly technical and classified information" (tr. 1/243). In most cases the nature of Mr. Stanvick's work did not generate a tangible work product. He did not send emails regarding his professional work; did not have a laptop from Raytheon; and his home computer was not cleared for classified work. Regarding consulting, he only used his computer to prepare his invoices. (Tr. 2/46, 74, 8/82, 89-99, 103-05, 110-11, 124, 127-30, 132-33, 139)

78

142. Raytheon stated in its amended response to interrogatory No. 19 in the government's second set of interrogatories that:

> In 2005, Mr. Stanvick performed much less work for Raytheon for various reasons, including the demands of Operation Iraqi Freedom lessened. In the majority of months in 2005, Mr. Stanvick performed no work at all for Raytheon.

(Supp. R4, tab 334 at 4374-75) Mr. Stanvick never saw this interrogatory response and was not asked to provide input to it. In his view "no work" was an overstatement. He was slowly winding down his work in 2005 as more individuals at Raytheon were getting trained properly. (Tr. 8/149-50) There is no evidence that Mr. Stanvick did not remain willing to perform.

143. As Mr. Powers affirmed, under his consulting agreements Mr. Stanvick was entitled to be paid for simply being available to perform work. As a consultant on retainer he did not necessarily have to perform work on a monthly basis. During the entire period from 2004 through 2005 he remained available to perform work as required. Although he was asked to continue, Mr. Stanvick ceased formal consulting work after 2005 because he felt he had worked for Raytheon long enough; he believed a consultant's active life was limited; other personnel were handling the systems quite well; and he moved to Maine. Thereafter, he provided some advice without charge. (Tr. 1/223, 8/97-98, 105-08, 139-40. 150)

144. Some of Mr. Stanvick's invoices of record for 2004 contain a brief description of the services he rendered, including *inter alia*, telephonic conferences, a Patriot meeting, and a Taiwan radar system Red Team; others do not. The 2005 invoices do not contain any descriptions of the work performed. The August 2004 and December 2005 invoices are missing from the record, but Mr. Stanvick would not have been paid had they not been submitted. He confirmed that he was paid for every month of 2004, but he was not asked about 2005. Mr. Stanvick acknowledged that he did not provide detailed reports with the invoices, as called for in his consulting agreements. Certain matters he worked on were not included in his invoices because of his adversity to writing and because some were classified. Although his October 2004 invoice includes attendance at an AUSA Soldier of the Year Award event, Raytheon coded the costs as unallowable and has not charged them to the government. (Supp. R4, tabs 152, 234; tr. 2/73, 8/101, 123-24, 133, 136-37)

145. Mr. Stanvick's invoices were reviewed and approved for payment by his sponsor, Tim Carey, a Raytheon missile engineer and executive in the Patriot Program Office who was personally familiar with Mr. Stanvick's consulting services, or by Mr. Carey's designee. A "sponsor" is the individual who initiates the retention of a

consultant. With the noted exception (finding 144), Mr. Stanvick's 2004 and 2005 costs were coded as allowable. In determining that Mr. Stanvick's costs were allowable, Mr. Powers relied upon having a current, fully executed consulting agreement, POs, and the approved invoices. He received a summary of those documents from the centralized contract administrator. (Supp. R4, tabs 152, 234; app. supp. R4, tabs 575, 624; tr. 1/189, 220-21, 223-24, 228, 231-33, 2/44-45, 47-49, 52-54, 8/108-110)

146. Mr. Stanvick's costs for CYs 2004 and 2005 total $126,046 (supp. R4, tab 315 at 3517 ($54,046 for 2004), tab 323 at 3684 ($72,000 for 2005); GPFF ¶ 288).

147. Mr. Powers provided DCAA with Mr. Stanvick's consulting agreements, POs, and his invoices. To Mr. Powers' knowledge, DCAA did not attempt to interview Mr. Stanvick or anyone in the Patriot Program Office to inquire about the nature of his work and there is no evidence that it did. (Tr. 1/251-52, 2/55-56, 76)

148. DACO Grzyb acknowledged that DCAA questioned, and he assessed penalties, on Mr. Stanvick's fees only under FAR 31.205-33(f), for alleged lack of written work product, and not under FAR 31.205-33(e). He also acknowledged that a retained consultant is entitled to be paid the amount of the retainer even if the consultant did not perform any work in a given month. (Tr. 3/5-7)

149. During negotiations over IDS' 2004 and 2005 incurred cost submissions, IDS withdrew Mr. Stanvick's consulting costs. This was not an agreement that the costs were unallowable or expressly unallowable but was part of attempts to settle and close out the years in question. (See supp. R4, tab 279 at 3068; tr. 1/108-09, 142, 251, 2/102-03)

### IDS Consultant Vice Admiral J. Guy Reynolds

150. Raytheon disputes the portion of DACO Grzyb's 19 July 2012 COFD that assessed penalties and interest due to IDS' inclusion of $216,540 in allegedly expressly unallowable trip costs for VADM Reynolds in its CY 2005 proposal. The government based its claim upon FAR 31.205-33(f) and an alleged lack of work product. DACO Grzyb's COFD regarding CY 2004 costs had similarly determined that VADM Reynolds' consulting costs for CY 2004 were expressly unallowable due to lack of work product, but the government withdrew this claim prior to the hearing. (Supp. R4, tab 323 at 3683-85; tr. 9/22, 24; GPFF ¶ 106 with app. add.)

151. VADM Reynolds, who died prior to the hearing, was "extremely well respected and also a legend in the submarine community" (tr. 9/54). According to Michael Charley, VADM Reynolds' technical contact at IDS, who tasked him with his consulting assignments (tr. 9/10-11), IDS retained VADM Reynolds as a consultant because:

Vice Admiral Reynolds was a very unique individual in that I believe he was the only naval officer, if not the only one, certainly one of the very few who held billets within the Navy at the level of admiral in the intel community, in the R&D community, and in the operational community. And because of that, he had an expertise and experience that is really second to none.... And of course as a business, you are interested in all of those areas.

...We were in the submarine business. So, he had very specific program experience and knowledge and product experience and knowledge. So, he was a very value-added commodity for us.

(Tr. 9/8-9) VADM Reynolds was not retained to, and did not, lobby Congress on behalf of Raytheon, although he did attempt to get U.S. Government work for Raytheon (tr. 9/13-14, 63; *see also* supp. R4, tab 238 at 2493 (Tasking Statement)).

152. In January 2005, via bilaterally executed PO, VADM Reynolds and Raytheon entered into the time-and-materials consulting agreement at issue, effective from 1 January 2005 to 31 December 2005 (supp. R4, tab 238 at 2489). The Statement of Work provided in part that VADM Reynolds was to "[a]ssist in the identification of business opportunities with the US Government and its Allies for [IDS], and provide strategic planning for future core business areas as requested" (*id.* at 2493). The level of effort was to be eight days per month (*id.*) The labor rate was $1,600 per day or fraction thereof. With prior approval of the Raytheon sponsor, Raytheon was to reimburse VADM Reynolds for reasonable domestic and international travel expenses to include, *inter alia*, economy or coach class airfare. (*Id.* at 2489)

153. VADM Reynolds' 2005 consulting agreement listed information "required by Raytheon Company and USG auditors for processing invoices," which included in part: the period of performance covered by the invoice; the program or task and person authorizing the task; expense statement with supporting documentation to substantiate the invoiced costs; and a "[d]etailed report of Consultant activities, for period being invoiced, to include recommended action for Raytheon Company" (supp. R4, tab 238 at 2489-90). VADM Reynolds' Tasking Statement for 2005 provided, *inter alia*:

Although Consultant will advise and inform appropriate IDS personnel of pertinent information as required and in a timely manner, Consultant will routinely provide, as a minimum, a monthly report of current activities, planned

81

projects, proposed initiatives and potential opportunities
worthy of IDS pursuit and development[.]

(Supp. R4, tab 238 at 2493)

154. As part of Mr. Powers' "scrub," he reviewed VADM Reynolds' costs for 2005 and decided to leave them coded as "allowable." He "probably" was looking at a summary from the centralized contract administrator of what information that office had. (Tr. 1/195-97, 256, 2/22; GPFF ¶ 313)

155. DACO Grzyb's IDS COFD, covering CY 2005, assessed penalties on the costs included in all of VADM Reynolds' invoices for 2005, which totaled $216,540 (supp. R4, tab 323 at 3684). Each invoice described his services as:

> [S]upport to Raytheon for activity including strategic
> planning for ship programs, torpedo systems, mine counter-
> measures, technology insertion, Tomahawk missile
> program, airborne ASW, international programs, meetings
> and travel as required.

(Supp. R4, tab 264 at 2776, 2783, 2793, 2802, 2811, 2822, 2831, 2850, 2857, 2863, 2877, 2869) They each stated that all work was performed for Mr. D.L. Smith (IDS' president) (tr. 9/15). Each listed support services as "Business Development," "Program Support" and "Report Preparation" and billed for various days of support at $1,600 per day. (R4, tab 264 at 2778) Except for the February 2005 invoice, which billed for six days of support at $9,600, but reflected no travel or meetings and did not describe VADM Reynolds' work (*id.* at 2877), the invoices described the purpose of the travel for which VADM Reynolds was billing, as follows: Brazil for business development with the Brazilian Navy (*id.* at 2777); San Diego, California, for business development and program review at "EWC" (*id.* at 2784); Bonn, Germany, for business development conference (*id.* at 2787); Kiel, Germany, and Amsterdam for business development at "RMC and in Amsterdam" (*id.* at 2794); San Diego for strategic dialogue at EWC and to meet with U.S. Government officials (*id.* at 2797); Athens, Greece, and Naples, Italy, for business development (*id.* at 2803); Newport, Rhode Island, for "Active Sonar/ Mammal Meeting at NIC" (*id.* at 2806); Groton, Connecticut, to attend "NDIA" conference (*id.* at 2812); Kiel and Hamburg, Germany, for business development (*id.* at 2816); Newport, Rhode Island, for "Strategic Dialogue at NIC" (*id.* at 2823); Newport for "Strategic Dialogue with NIC and Torpedoes at NUWC" (*id.* at 2826); San Diego to attend "NDIA ASW Conference" (*id.* at 2832); Newport for "Strategic Dialogue at NIS and NUWC" (*id.* at 2836); Honolulu, Hawaii, for "Calls with Commander Pacific Command, CINCPACFLT, Deputy CINCPACFLT, CSP, P-CSP & attend Submarine Conference" (*id.* at 2840); Amsterdam to attend "UDT [Undersea Defense Technology] Europe 2005" (*id.* at 2851; *see* tr. 9/50); Hawaii to visit

82

"CPF, CSP and SDVT-1" (*id.* at 2858); Tucson, Arizona, for "Precision Strike SBA Meeting" (*id.* at 2864 (12/04 expense billed in 2005)); Newport, Rhode Island, for "Strategic Dialogue at NIS" (*id.* at 2870); and Norfolk, Virginia, for discussions at Joint Forces Command (*id.* at 2873). VADM Reynolds certified the invoices, which were accompanied by detailed receipts (supp. R4, tab 264).

156. Mr. Charley, who was credible, testified that VADM Reynolds prepared trip reports for every trip he took for Raytheon, including during 2005. Although there are examples of VADM Reynolds' reports for 2004 in the record (*e.g.*, supp. R4, tab 272; app. supp. R4, tab 553) (no longer at issue because Raytheon withdrew his 2004 costs and the government withdrew its penalty claim (finding 137)), there are none for 2005. VADM Reynolds' computer's hard drive crashed and he was unable to retrieve his reports. VADM Reynolds asked Raytheon for assistance but Raytheon was not able to locate the reports for 2005. According to Mr. Charley, VADM Reynolds' 2004 work product was typical of his work product for 2005. (Tr. 2/43, 9/35, 39, 42, 45, 48, 52-53; ex. G-1 at 9682, 9689)

157. According to Mr. Charley, VADM Reynolds "generated a lot of written documentation. He was extremely organized and methodical." (Tr. 9/14) He "was very meticulous in filing trip reports, very detailed trip reports also" (tr. 9/14-15). He communicated primarily by email with IDS president Smith and mostly spoke by telephone with Mr. Charley. His advice by email to Mr. Smith continued throughout 2004 and 2005 and the 2004 emails were typical of those in 2005. (*E.g.*, app. supp. R4, tab 543 (2004 emails); tr. 7/201, 9/15, 25, 32). Although Raytheon conducted a search, due to the fact that Messrs. Smith and Charley are no longer with IDS, and due to Raytheon's standard computer recycling and electronic data retention policies, emails pertaining to VADM Reynolds from April 2004 through December 2005 are no longer available. It was not Mr. Charley's practice to retain emails or trip reports. In his position, he received 300 or 400 emails a day. He would retain the relevant information in another manner. Due to a litigation hold in another matter Raytheon was able to retrieve numerous emails between Mr. Smith and VADM Reynolds between January and March 2004 and approximately 776 such emails between November 2006 and August 2009. (Tr. 7/201-06; 209-19, 9/60-62; ex. A-22 (notarized decl. of Woods K. Abbott) ¶¶ 7-10) We find that the emails of record evidence VADM Reynolds' regular contact with IDS and the nature of the work he was performing for IDS, even if they were not sent in 2005 (*see*, *e.g.*, app. supp. R4, tab 543).

158. Mr. Charley never discussed VADM Reynolds' work with DCAA or DCMA. DCAA never sought to interview anybody regarding VADM Reynolds' work but sought documentation of his work. (Tr. 2/76-77, 9/57) DCAA's "Negotiation Notes for CY 2005 IDS 4-10-2011 Meeting" state regarding VADM Reynolds' costs:

Raytheon argued that they have provided 2/3 of the required documents. Raytheon believes that this should be taken into consideration. The DACO stated that he is inclined to sustain the questioned costs due to a lack of work product. However, he did not make a final decision.

(Ex. G-1 at 9702)

159. Based upon all of the evidence, we find that Mr. Stanvick's and VADM Reynolds' consultant fees were reasonable.

## ASBCA Nos. 57798 and 58280 Discussion

### The Parties' Contentions

The government contends that IDS included consultant costs in its incurred costs proposals for CYs 2004 and 2005 that were expressly unallowable under FAR 31.205-33(f), which it asserts requires each of three forms of support: details of all agreements; invoices or billings; and work product and related documents. The government alleges that, for the fees of consultants on retainer to be allowable, the contractor must support them with the evidence listed in FAR 31.205-33(e), which incorporates the documentation requirements of FAR 31.205-33(f). The government asserts that a long history of consulting costs challenged by DCAA and DCMA, including Raytheon's failure to appeal and its past payment of certain assessed penalties on consulting costs, establish that Raytheon could not reasonably have concluded that any unsupported consultant costs could be allowable; Raytheon's internal FAR Part 31 guidelines, corporate policy and training instructions were to the contrary. The government further contends that, for years, Raytheon did not obtain consultant agreements, purchase orders, invoices and/or work product regarding its consultants and often did not retain work product alleged to have been received. Moreover, Raytheon did not attempt to verify contemporaneously that it had supporting documentation before claiming the consultant costs at issue and belatedly first presented inadequate or unpersuasive evidence on the disputed costs at the hearing in these appeals.

Specifically, regarding Mr. Stanvick, the government alleges that his costs are expressly unallowable for 2004 and 2005 because Raytheon failed to produce sufficiently detailed invoices or any work product and related documents associated with his services for CYs 2004 and 2005 or any support for his retainer fees. Regarding VADM Reynolds, the government contends that his costs are expressly unallowable for 2005 because Raytheon failed to produce any work product and related documents.

Raytheon responds that the consultant costs that the government deems to be inadequately supported are not expressly unallowable. FAR 31.205-33(f) does not require any documentation; it merely requires evidence of the nature and scope of the service

84

furnished, which can be in the form of oral testimony. Raytheon contends that the "long history" of allegedly unsupported consulting costs cited by the government does not apply to these appeals because the circumstances are factually and legally distinguishable (app. br. at 155). There were lump sum settlements for CYs 2000 and 2001 and IDS did not agree that inadequately supported consultant costs were expressly unallowable.

Raytheon states that DACO Grzyb disallowed and penalized Mr. Stanvick's costs solely on the ground that they were inadequately supported and thus allegedly expressly unallowable under FAR 31.205-33(f). The government did not rest its claim on FAR 31.205-33(e). Raytheon contends that the documentary and testimonial evidence it presented demonstrated the nature and scope of Mr. Stanvick's services and that the work he performed was proper and did not violate law or regulation, which is all that FAR 31.205-33(f) requires. Thus, Mr. Stanvick's costs were allowable and the government failed to meet its burden to prove that they were expressly unallowable.

Similarly, Raytheon asserts that DACO Grzyb disallowed and penalized VADM Reynolds' costs on the sole basis of lack of written work product. However, Raytheon presented documentary and testimonial evidence that demonstrated the nature and scope of VADM Reynolds' services and that the work he performed was proper and did not violate law or regulation. Thus, VADM Reynolds' costs were allowable and the government failed to meet its burden to prove that they were expressly unallowable.

Ruling

FAR 31.205-33(b) opens with the premise that costs of consultant services are allowable when reasonable in relation to the services rendered, subject to exceptions. FAR 31.205-33(d) notes that, in determining cost allowability, including retainer fees, "no single factor or any combination of factors is necessarily determinative." Among other things, in assessing consultant cost allowability, a CO is to consider the qualifications of the consultant and the adequacy of the contractual agreement for the service. FAR 31.205-33(d)(7), (8). For consultants on retainer, such as Mr. Stanvick, there are some specific requirements, set forth in FAR 31.205-33(e). For example, retainer fees must be supported by evidence that the services are necessary and customary, reasonable, and documented in accordance with FAR 31.205-33(f). However, if no services are rendered, fees are not automatically unallowable.

FAR 31.205-33(f) recognizes that retainer agreements generally are not based upon specific statements of work. Evidence necessary to determine that the work performed is proper and does not violate law or regulation is to include agreement details; invoices that show services performed; and work products and related documents. The drafters of FAR 31.205-33(f) were concerned that a consultant's billings made sense in light of the output received. If substantial funds had been paid but there was little or no evidence of the consultant's work, this might indicate that the

funds were employed for suspect purposes, such as bribes. The government was to determine that funds were not being spent on questionable activities. The drafters noted that the paramount concern was evidence of the reasonableness and legitimacy of the costs. not necessarily documentation. While the three sorts of evidence listed above were to be provided. auditor judgment was important and an auditor should not insist upon a work product if other evidence was sufficient to determine the nature and scope of the actual work performed by the consultant. (Findings 99-101)

A 19 December 2013 MRD, albeit issued after the IDS audits and COFDs at issue, expresses similar themes. It states that auditor judgment is critically important in determining whether the totality of the evidence demonstrates the nature and scope of the consultant's services and that the type of evidence can vary significantly from case to case based upon the type of consulting effort. Information on an invoice or some other evidence of the service provided could suffice and a contractor may provide evidence created when the contractor incurred the cost as well as evidence from a later period, including through a meeting, to obtain oral or written documentation. (Finding 102)

Here. the evidence establishes that both Mr. Stanvick and VADM Reynolds were distinguished individuals with significant experience relevant to Raytheon's work on the Patriot Missile system, submarines, and otherwise (findings 138, 141, 151), and they clearly qualified as consultants under FAR 31.205-33(a). Both gentlemen had written consulting agreements for the periods at issue and their fees were reasonable (findings 140, 152, 159). There is no glimmer of evidence or concern that their consultant fees were employed for the suspect, illegitimate or illegal purposes of which the FAR 31.205-33(f) drafters were wary (finding 99).

The COFDs at issue and the government have focused principally upon the work product requirements of FAR 31.205-33(f), cited in the COFD covering 2004 costs (the COFD for 2005 refers to FAR 31.205-33 in general) (findings 127, 132). Some of Mr. Stanvick's invoices contained a description of his services and others did not. Although he did not prepare written reports in support of his invoices, Mr. Stanvick's and Mr. Powers' credible testimony evidenced Mr. Stanvick's work product, some of which was written but most of which was oral, and his readiness to perform when called upon by Raytheon (findings 141, 143-45). Although Mr. Stanvick was winding down his work for Raytheon in 2005, there is no evidence that he did not remain willing to perform (finding 142). Indeed, FAR 31.205-33(e)(2) notes that, even if no services are rendered by a consultant on retainer, fees are not automatically unallowable (finding 96).

The drafters of FAR 31.205-33(f) commented upon the importance of the exercise of judgment in evaluating whether work product requirements were met and that other than written evidence could establish the nature and scope of a consultant's services. Recently, the Board found consulting costs to be allowable when supported by other evidence, even if there was no written work product. *Technology Systems, Inc.*, ASBCA

No. 59577, 17-1 BCA ¶ 36,631 at 178,390, 178,392. In any case, much of Mr. Stanvick's work was classified and his work product could not be publicly disseminated or retained (findings 141, 144). This is comparable in part to an attorney's advice to his client, cited in DCAA's 9 May 2002 MRD as an example of an occasion when there can be sufficient evidence of work performed, even if the actual work product is not provided. (Findings 99, 101, *see also* finding 102)

Regarding the late VADM Reynolds, all but one of his invoices for 2005 contained descriptions of his services (finding 155). Mr. Charley's credible testimony evidenced that VADM Reynolds prepared trip reports for every trip he took for Raytheon in 2005, similar to his 2004 reports of record, although VADM Reynolds' computer had crashed and he no longer had the 2005 reports. Mr. Charley also testified credibly that VADM Reynolds generated considerable written communications and that he was very meticulous in filing detailed trip reports. (Findings 156-57)

Based upon the evidence adduced at the hearing, we determine that it was not unreasonable under the circumstances for Raytheon to conclude that Mr. Stanvick's consultant costs for 2004 and 2005 were allowable and that VADM Reynolds' consultant costs for 2005 were allowable. The government has not met its burden to prove that the consultant costs were expressly unallowable.

We sustain Raytheon's appeals in ASBCA Nos. 57798 and 58280.

## DECISION SUMMARY

(1) Prior to the hearing Raytheon agreed to withdraw the following of its 2004 Corporate costs, without conceding that they were unallowable, and the government withdrew its associated penalty claims: Indra, Genesee, and Recruiting (Reminder Items). The government also withdrew its claim regarding T.A.B. Associates. (Finding 18) Prior to the hearing Raytheon also agreed to withdraw IDS' 2004 costs for VADM Reynolds and TJK Consultants and its 2005 costs for Kissinger McLarty Associates, without conceding that they were unallowable, and the government withdrew its penalty claims regarding those costs (findings 137, 150). These matters are now moot and the associated portions of Raytheon's appeal are dismissed without prejudice. *See Combat Support Associates*, ASBCA Nos. 58945, 58946, 16-1 BCA ¶ 36,288 at 176,973.

(2) Raytheon's motions to dismiss for lack of jurisdiction on the ground that the government did not originally identify the contracts or test contract under which the disputes arose and that it improperly revised and increased its fractional aircraft lease claims by relying upon the 2005 Advance Agreement are denied.

(3) Raytheon's renewed motion to strike is denied.

(4) Raytheon's appeal in ASBCA No. 57743 from the government's claim for penalties and interest concerning aircraft fractional lease costs is sustained.

(5) Raytheon's appeal in ASBCA No. 57743 from the government's claim for penalties and interest concerning Challenger 604 aircraft costs is sustained.

(6) Raytheon's appeal in ASBCA No. 57743 from the government's claim for penalties and interest concerning Icent costs to design and build an M&A database is sustained.

(7) Raytheon's appeal in ASBCA No. 57743 from the government's failure to waive penalties and interest assessed regarding lobbying costs is denied.

(8) Raytheon's appeals in ASBCA Nos. 57798 and 58280 from the government's assessment of penalties and interest regarding consulting costs are sustained.

(9) Remaining quantum issues are remanded to the parties for resolution. If they are unable to resolve them they are to notify the Board, which will then conduct quantum proceedings.

Dated: 17 April 2017

CHERYL L. SCOTT
Administrative Judge
Armed Services Board
of Contract Appeals

I concur

RICHARD SHACKLEFORD
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

I concur

DAVID D'ALESSANDRIS
Administrative Judge
Acting Vice Chairman
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA Nos. 57743, 57798, 58280, Appeals of Raytheon Company, rendered in conformance with the Board's Charter.

Dated:

JEFFREY D. GARDIN
Recorder, Armed Services
Board of Contract Appeals